GEORGE H. H. BUTLER, Appellant, *v.* FREDERICK C. PRENTISS, Respondent.

1. PARTNERSHIP — FIDUCIARY RELATION. Copartners owe to each other the most scrupulous good faith; each one has a right to know all that the other knows, and the *uberrima fides* of a fiduciary relation is the standard of fidelity exacted from them.

2. SUPERIORITY OF ONE PARTY IN FIDUCIARY RELATION. Where fiduciary relations exist and a condition of superiority is held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit equity raises a presumption against its validity and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption.

3. CONTRACT INDUCED BY ABUSE OF FIDUCIARY RELATIONS. Where, in an action to dissolve a partnership and for an accounting, it appears that

7

in addition to the business relation of copartners there was a general relation of trust and confidence, and that the plaintiff, who knew little about the business, trusted the defendant, who was older, the superior in business experience and ability, and well acquainted with the business, a case is presented where, in the absence of acquiescence, the defendant should not be permitted to profit by a contract whereby the terms of the partnership were changed to his advantage at the expense of the plaintiff, and in making which the defendant encouraged the plaintiff to act under a mistake as to a fact of importance, caused by a misrepresentation made in his presence, not only undenied by him but made the basis of an argument to persuade the plaintiff to enter into the contract.

4. CONTRACT ENTIRELY DESTROYED BY PARTIAL MISREPRESENTATION. The effect of partial misrepresentation is not to alter or modify the agreement *pro tanto,* but to destroy it entirely and to operate as a personal bar to the party who practiced it; and the party deceived has a right to have the whole contract set aside.

5. ENTIRE CONTRACT AFFECTED BY FRAUD. Where a contract covering sundry provisions all relating to the same subject, such as new terms for an existing partnership, advantageous to the trusted party and disadvantageous to the other, obtained by the improper exercise of fiduciary relations, is made upon one occasion and upon a single consideration and assent, in reliance upon the same erroneous statement, it is so entire as to be wholly affected by fraud and to call for relief, in equity, from all its provisions, although the erroneous statement referred directly to only one provision.

6. RESTORATION OF PARTY GUILTY OF FRAUD TO ORIGINAL CONDITION. When, without fault on the part of the one defrauded, seeking relief in equity on account of advantage taken of fiduciary relations, it is impossible to restore the one guilty of the fraud to his original condition, the general rule of restoration is not strictly applied. Equity makes a reasonable application of the rule by requiring whatever fair dealing requires under all the circumstances of the particular case, but it does not permit the rule to become a shield for wrongdoing.

*Butler* v. *Prentiss,* 91 Hun, 643, modified.

(Argued December 14, 1898; decided January 10, 1899.)

APPEAL from a judgment of the late General Term of the Supreme Court in the first judicial department, entered December 26, 1895, modifying and affirming interlocutory and final judgments entered upon the report of a referee.

The nature of the action and the facts, so far as applicable to the question discussed, appear in the opinion.

*J. Hampden Dougherty* for appellant. A confidential relation existed between the parties, and equity will not sanc-

tion any part of the agreement of January, 1889. (*Cowee* v. *Cornell*, 75 N. Y. 91; Pom. Eq. Juris. § 951; Story's Eq. Juris. § 308; *Tate* v. *Williamson*, L. R. [1 Eq.] 528; *Platt* v. *Platt*, 2 T. & C. 25; *Sears* v. *Shafer*, 6 N. Y. 268; *Rhodes* v. *Bate*, L. R. [1 Ch. App.] 252; 1 Bigelow on Fraud, 365; *Maddeford* v. *Austwick*, 1 Sim. 89; *Dent* v. *Bennett*, 4 M. & C. 269; *Brooks* v. *Martin*, 2 Wall. 70; Lindley on Part. 303; Bates on Part. §§ 303, 309; *Holmes* v. *Gilman*, 138 N. Y. 377; *Mitchell* v. *Reed*, 61 N. Y. 126.) The General Term erred in holding that nothing short of a fraudulent misrepresentation would, in a court of equity, suffice to vitiate the entire agreement. (Pom. Eq. Juris. § 888; *Hart* v. *Swaine*, L. R. [7 Ch. Div.] 42; Perry on Trusts, § 171; *Sharp* v. *Mayor*, etc., 40 Barb. 269; *Gale* v. *Gale*, 19 Barb. 251; *Peek* v. *Gurney*, L. R. [13 Eq.] 79; *Hammond* v. *Pennock*, 61 N. Y. 145; *Kountze* v. *Kennedy*, 147 N. Y. 129; *Rawlins* v. *Wickham*, 3 De G. & J. 304.) The agreement should be set aside *in toto*, inasmuch as it was one entire agreement made in reliance upon the defendant's and the manager's untrue and incorrect statement that the depreciation account gave plaintiff eleven per cent upon his capital. (Beach on Eq. Juris. § 73.) The finding of the referee, that so much of the agreement as provided for an equal division of losses from January 1, 1887, was fair and reasonable, was without any evidence to sustain it. The finding means only that that part of the agreement would not in itself have been unfair had it not been affected by the eleven per cent misrepresentation. (*Matter of A. L. Assn.*, L. R. [16 Ch. Div.] 83; *Whitcomb* v. *Converse*, 119 Mass. 38.) The defendant's contention, that he had been betrayed by plaintiff's agreement concerning the losses into continuing the business, is untenable. (*Hammond* v. *Pennock*, 61 N. Y. 152; *Masson* v. *Bovet*, 1 Den. 74; 2 Pom. Eq. Juris. § 899; *Reynell* v. *Sprye*, 8 Hare, 222; 1 De G., M. & G. 660; Beach on Mod. Eq. Juris. 74, 75, § 73.) If the plaintiff is to take $60,000 or less of machinery (really $25,000) in full of his capital account, then the defendant ought to sustain his own loss upon capital. (*Hasbrouck* v. *Childs*, 3 Bosw. 105; Story

on Part. §§ 27, 29 ; *Heran* v. *Bell,* 1 B. Mon. 159 ; *Rau* v.
*Boyle,* 5 Bush, 253 ; *Cameron* v. *Watson,* 10 Rich. Eq. 64.)

*John L. Hill* for respondent. The referee's findings are
fully sustained by the evidence. (*Smith* v. *Smith,* 125 N. Y.
224 ; Bates on Part. § 820 ; *Flagg* v. *Stowe,* 85 Ill. 165 ;
*Palmer* v. *Tyler,* 15 Minn. 106 ; *Von Sachs* v. *Kretz,* 72 N.
Y. 548 ; Whart. on Ev. §§ 1156, 1158 ; *Blood* v. *Kane,* 130
N. Y. 514.) The decisions of the referee and General Term
are right so far as they relate to rent and the division of losses.
(*Masson* v. *Bovet,* 1 Den. 69 ; *Hammond* v. *Pennock,* 61 N.
Y. 153 ; *S. O. Co.* v. *T. Ins. Co.,* 64 N. Y. 85 ; *Carman* v.
*Pultz,* 21 N. Y. 547 ; *Grant* v. *Morse,* 22 N. Y. 323 ; *Phelps*
v. *McDonald,* 26 N. Y. 82 ; *White* v. *Benjamin,* 150 N. Y.
264 ; *Koehler* v. *Hughes,* 148 N. Y. 507 ; *Szuchy* v. *H. C. &
I. Co.,* 150 N. Y. 219.) The arrangement to waive deprecia-
tion, reduce rent and divide losses equally, was sustained by
ample consideration. (*White* v. *Baxter,* 71 N. Y. 254.)

VANN, J. This action was brought on the second of August,
1890, to dissolve a copartnership between the plaintiff and
defendant, and for an accounting as to all of their partnership
dealings and transactions.

On the 1st of May, 1880, Edwin T. Butler, the father of
the plaintiff, entered into partnership with the defendant to
carry on the business of manufacturing woolen yarns under
an oral agreement whereby said Butler was to rent to the
firm a certain building to him belonging, and in which he had
been manufacturing woolen yarns and other wares, at a rent
reserved of $3,500 per year. He was to furnish for the use
of the firm certain machinery in said building at an appraised
valuation. He was not required to furnish any cash capital,
and he was to retain the title to such machinery. The defend-
ant was to furnish a sum of money equal to said appraised
value of the machinery and to have it credited to him in his
capital account. The value of the machinery, as appraised,
was to be entered in the capital account of said Butler, and
each partner was to be credited every year at the rate of six

per cent on his capital account, while the profits remaining after that were to be so divided that Butler should receive forty-five and the defendant fifty-five per cent thereof. In order to offset the wear and tear of machinery, an account, called a depreciation account, was opened for the benefit of said Butler, which was intended to represent the depreciation in the value of his machinery over and above ordinary repairs, and pursuant to the agreement of the parties, five per cent on the machinery capital account of Butler was annually debited to that account and credited to the depreciation account. The effect of this was to convert the wear and tear of machinery into cash capital by reducing the machinery capital account and increasing the money capital account by the same amount each year. It was understood that Butler was to be credited with six per cent on the book value of his machinery as thus reduced, and also with six per cent on the depreciation account, and that five per cent annually would "fairly represent the average deterioration in the machines despite repairs." It was intended that the six per cent allowed to defendant was for interest on the money put in by him, and that the six per cent allowed to Mr. Butler on his machinery capital account was for the use of his machinery, while the six per cent allowed him on his depreciation account was for interest on his money capital. The evidence to establish this contract was largely derived from the books as neither party thereto could speak upon the subject.

Under this agreement, subsequently changed so that after May 1st, 1881, the profits were to be divided equally, Mr. Butler and the defendant did a prosperous business until the death of the former on the 18th of April, 1884. By his will he left to his widow, who was appointed sole executrix, and to the plaintiff, their only child, his interest in said business. With no liquidation of the partnership affairs, the business was continued by the widow and the defendant, who were distantly related, on the same terms as it had been carried on during the lifetime of the testator, but for the benefit of the three persons then interested. In consideration, however, of

the promise of the defendant to assist the widow in closing up her husband's business with the survivors of another firm, of which he was a member, and of the fact that the defendant was to have the sole management of the manufacturing business thus continued, it was agreed that his share of the profits should be increased to seventy-five per cent.

The widow died on the 30th of December, 1884, intestate, leaving plaintiff as her only next of kin and heir at law, and he became administrator of both estates.

The business of the year 1884 was profitable, and early in 1885, upon the solicitation of the defendant, the plaintiff and he, who were cordial and affectionate friends, agreed to become partners and to continue the business upon the same terms that existed at the death of the widow. The plaintiff, then about twenty-three years of age, was not a business man, but had qualified himself as a clergyman, and during the greater part of the time while he was a partner of the defendant he was engaged in publishing and printing a work called "The Catholic Faith." It was understood that the responsibility of conducting the business should fall on the defendant, and that the plaintiff should take only such part therein as he chose. "The defendant knew that the plaintiff valued his advice and opinions and was disposed to rely upon them."

During the year 1885 the business prospect was so bright that on the defendant's advice the mill was enlarged by the expenditure of over $50,000, and new machinery was purchased at an expense of about $75,000, all of which was to be furnished by the plaintiff. By the aid of the defendant he procured loans on collateral to a certain amount, which he paid towards these expenditures, and the defendant furnished the remainder under the agreement that each partner should receive credit on his personal account for the sum furnished by him, and that the amount furnished by the defendant should be a lien on plaintiff's entire property so far as invested or used in the business, including the real estate. The rent of the mill was thereupon increased to the sum of $6,000 a year.

After awhile losses came to the firm, and the defendant

became restless over the prospect of sharing them on the same basis as the profits were divided, although there had been no express agreement upon the subject. The plaintiff, upon the suggestion of the defendant, made repeated concessions by which he yielded some of his rights. The defendant declared that he wished to withdraw from the business, but at the same time represented to the plaintiff that it was important to his interests that the business should be continued. At an interview between them in 1888, the manager of the manufactory, a cousin of defendant, was present, and stated to plaintiff that his depreciation account was an injustice to the firm, as it resulted in his receiving eleven per cent on his capital, while the defendant was receiving only six per cent. "This statement was incorrect and misleading," as the referee found, "in that the allowance annually made to the plaintiff upon the books of said firm for depreciation did not give plaintiff eleven per cent, but only six per cent upon the amount to the credit of his capital account and depreciation account." The defendant omitted to contradict or correct said statement of the manager, but contended that plaintiff should bear one-half of the losses. He also threatened to withdraw from the business "unless the losses already accrued, and those that might thereafter accrue, should be borne by the partners equally, and the right to depreciation should be given up for the future, and that the profits should be divided seventy-five per cent and twenty-five per cent as before." The plaintiff had an opportunity to learn the facts through the books, but they were unusually complicated and confusing. He had never studied bookkeeping; did not know much about this business or about any business, and he reposed great confidence in the defendant's experience and integrity, as the latter well knew. He, however, "appreciated the fact that if the business ceased his mill and machinery would be thrown back on his hands at a time of great depression in that branch of the business," and he desired to avoid that result. After considerable negotiation between the partners, it was agreed between them in January, 1889, "that plaintiff should bear one-half the losses

of the business, past and future, and waive his right to depreciation for 1887 as well as 1888, and in the future, and that the rent for the use of the mill and real estate should be reduced from $6,000 to $5,000 per year, and that the profits of the business, if any, should be divided, seventy-five per cent to Mr. Prentiss and twenty-five per cent to plaintiff as before." The plaintiff " did not then understand the true relation between his depreciation and capital accounts, so far as it affected the aggregate to which he was entitled, and with which he had been credited on the firm books," and in giving his assent to said agreement, he relied upon " previous representations made by said (manager) and the defendant  *  *  * that his depreciation was an injustice to the defendant, and gave him, the plaintiff, eleven per cent upon his capital," while the defendant had only six per cent upon his capital. The defendant never explained to him the meaning and purpose of the depreciation account, and never informed him that the capital account was reduced by the amounts credited to depreciation. The plaintiff recognized and fairly understood that the division of losses in the same ratio as profits was unfair to defendant, and he made the concession to bear one-half of the losses, as well as to reduce the rental of the mill, intelligently. The agreement, as the referee found, " to reduce the rent and to divide the losses equally was fair and reasonable, but the agreement that plaintiff should waive his right to depreciation was unfair and unreasonable." The defendant threatened to forthwith withdraw from the business unless the plaintiff made said arrangement of January, 1889, and while the plaintiff assented to that arrangement, the defendant reserved the right, as before, to terminate the partnership at any time. The referee distinctly found that the plaintiff entered into that agreement in reliance upon the representations in effect made by the defendant, " that his depreciation was an injustice to the defendant, and gave him, the plaintiff, eleven per cent upon his capital."

After finding these facts in substance, with many others not now material, the referee corrected various errors upon the

books, and otherwise, not before us on this review. Although the defendant alleged in his answer that the errors on the books would not exceed $100, errors against the plaintiff were found and corrected by the referee amounting to over $40,000. Among his conclusions of law he found that "the relation between the plaintiff and the defendant as managing partner was such that the defendant was disqualified from accepting from the plaintiff a surrender of the plaintiff's depreciation account without at some time prior thereto putting the plaintiff in possession of all the information which the defendant possessed in respect to the purpose of the depreciation account, the meaning of said account, and its effect upon the capital account; that in view of the relationship between the parties no contract between them can be upheld if it was brought about by concealment or unfairness on the part of the defendant;" that "the depreciation account of the plaintiff should be reinstated," but that the plaintiff had "failed on the merits to establish any cause of complaint against" the agreement of January, 1889, "except so far as relates to the surrender of his right to depreciation."

Upon the request of the defendant he found, as a conclusion of law, that "the plaintiff has failed on the merits to establish any fraud, undue influence or unfairness in the agreement made in January, 1889, so far as it related to division of losses, past and future, and to reduction of rent from $6,000 to $5,000 per year." The General Term modified the judgment entered upon the report of the referee in a respect not now important, and affirmed it as thus modified.

Although the learned referee in his main findings for the judgment roll found that the entire agreement was procured by misrepresentation, he upheld two-thirds of it because he thought it was reasonable to that extent, and set aside the other third because he thought it was unreasonable.

Confidential relations existed between the parties, and in making the contract in question they did not stand on an equal footing. In addition to the relation of copartners, there was a general relation of trust and confidence existing between

8

them. They were old and affectionate friends. The plaintiff, without business experience himself, rested upon the large experience of the defendant, confided in him and trusted him, and the defendant knew it. One was skillful in business, the other a novice who relied upon the experience, judgment and integrity of his friend. One knew the subject of the deal thoroughly, the other did not. The one with knowledge, experience and skill sought to obtain valuable concessions from his ill-posted and inexperienced friend. While the defendant's lips did not make the false representation, he adopted it when made by a third person in his presence and for his benefit, knowing that it was false, and that the plaintiff believed it and acted on it as true. He not only assented to it by not correcting it, but he followed it up by stating that it was virtually taking money out of his own pocket and giving it to the plaintiff. He knowingly allowed a vital fact to be misrepresented to the plaintiff, and, with no explanation, dealt with him on the strength of it. He knew that the plaintiff was contracting with him in reliance upon that statement, yet he made no attempt to set him right upon the subject. Aided by this statement he persuaded the plaintiff to give up valuable rights for no consideration, except the continuance of the business, which the defendant reserved the right to terminate at any time. Having obtained these concessions, he could have ended the business the next day. The false statement was of a material fact and was an inducing cause, if not the sole inducing cause, that secured the plaintiff's assent to the agreement.

As was said in *Mitchell* v. *Reed* (61 N. Y. 123, 126) : " The relation of partners with each other is one of trust and confidence. Each is the general agent of the firm, and is bound to act in entire good faith to the other. The functions, rights and duties of partners in a great measure comprehend those both of trustees and agents, and the general rules of law applicable to such characters are applicable to them."

In *Maddeford* v. *Austwick* (1 Sim. 89 ; affirmed in 2 Myl. & K. 279) the court said : " The defendant, being the partner

whose business it was to keep the accounts of the concern, could not, in fairness, deal with the plaintiff for his share of the profits of the concern, without putting him into possession of all the information which he himself had with respect to the state of the accounts between them. The defendant knew, from the account in his possession, that the £1,000 was not an adequate consideration for the plaintiff's share of profits, and he cannot be permitted, in a court of equity, to maintain advantage which he has gained over the plaintiff's ignorance. * * * The supposed account of the profits of the concern, up to the end of 1817, necessarily formed the basis of the plaintiff's calculation of profits for the ensuing three years, and, being misled in that respect, he is entitled to avoid the whole agreement, and to have an account of the profits of the concern up to the dissolution in 1821. The defendant's argument of confirmation of the agreement by the subsequent conduct of the plaintiff, fails altogether, it not being pretended that, at the time of such acts on the part of the plaintiff, he was aware of the advantage which the defendant had gained over him."

A learned author speaking upon this subject has recently said: "The partners owe to each other the most scrupulous good faith. Each one has a right to know all that the others know, and their connection is one of great confidence; and the *uberrima fides* of a fiduciary relation will be the standard of fidelity exacted from them. * * * There is no principle of law that prevents one partner buying out the interest of the other, or selling to him in good faith, provided he acquires no secret benefit for himself at the expense of his copartner, by suppressing information or concealing facts which the latter was entitled to know. * * * But deception of any kind or the non-disclosure of material facts, especially by a managing partner, will vitiate the sale." (Bates on the Law of Partnership, §§ 303, 309.)

So Judge Story, in his valuable work on Partnership (§ 172), says: "Good faith not only requires that every partner should not make any false representation to his partners, but also that he should abstain from all concealments which may

be injurious to the partnership business. If, therefore, any partner is guilty of any such concealment, and derives a private benefit therefrom, he will be compelled in equity to account therefor to the partnership. Upon the like ground, where one partner, who exclusively superintended the accounts of · the concern, had agreed to purchase the share of his copartners in the business for a sum which he knew, from the accounts in his possession, but which he concealed from them, to be for an inadequate consideration, the bargain was set aside in equity as a constructive fraud; for he·could not in fairness deal with the other partners for their share of the profits of the concern without putting them in possession ·of all the information which he himself had with respect to the state of the accounts and the value of the concern." (See, also, *Kimberly* v. *Arms*, 129 U. S. 512; Lindley on Partnership, 303; Parsons on Partnership, 192.)

But in ·addition to the business relations' of the parties, their personal relations were intimate and confidential, and the plaintiff trusted the defendant as an old friend, superior to himself in business experience and ability. Moreover, the defendant, who knew all about the books and business, encouraged the plaintiff, who knew little about either, to act under a mistake as to a fact of great importance, caused by a misrepresentation made in his presence, not only undenied by him, but made the basis of an argument to persuade the plaintiff to enter into the contract.

In *Hammond* v. *Pennock* (61 N. Y. 145, 152) this court said: "The case has thus far been considered as though the fraud requisite as a basis for rescinding a contract in equity is the same in nature as that demanded in a court of law in an action for damages for deceit. In equity, the right to relief is derived from the suppression or misrepresentation of a material fact, though there be no intent to defraud. * * * This doctrine is, substantially, grounded in fraud, since the misrepresentation operates as a surprise and imposition upon the opposite party to the contract.· It is inequitable and unconscientious for a party to insist on holding the benefit of a con-

tract which he has obtained through misrepresentations, however innocently made." (Citing *Peek* v. *Gurney*, L. R. [13 Eq.] 79, 113; *Wilcox* v. *Iowa University*, 32 Iowa, 367; *Smith* v. *Reese River Co.*, L. R. [2 Eq.] 264; *Kennedy* v. *Panama Co.*, L. R., [2 Q. B.] 580; 1 Story on Eq. Jur. § 193 and cases cited; Perry on Trusts, § 171.)

In *Brooks* v. *Martin* (2 Wall. 70, 82) the Supreme Court of the United States said that "If the parties are to be regarded in this transaction as holding towards each other no different relations from those which ordinarily attend buyer and seller, and as, therefore, under no special obligation to deal conscientiously with each other, we are satisfied that no such fraud is proven as would justify a court in setting aside an executed contract. But there are relations of trust and confidence which one man may occupy towards another, either personally or in regard to the particular property which is the subject of the contract, which impose upon him a special and peculiar obligation to deal with the other person towards whom he stands so related, with a candor, a fairness, and a refusal to avail himself of any advantage of superior information, or other favorable circumstances, not required by courts of justice in the usual business transactions of life."

The conclusion of the learned referee, that the plaintiff assented to the agreement in reliance upon previous misrepresentations made by the manager "and the defendant," was clearly right, but we think that he did not give to that conclusion the full force required by law, as he granted the plaintiff relief only as to a part of the arrangement. He appears to have proceeded on the theory that the defendant was guilty of constructive fraud as distinguished from moral fraud. Constructive fraud, however, sometimes called legal fraud, is, nevertheless, fraud, although it rests more upon presumption and less upon furtive intent than moral fraud. (*Cowee* v. *Cornell*, 75 N. Y. 91, 99.) Where fiduciary relations exist, and a condition of superiority is held by one of the parties over the other, "in every transaction between them by which the superior party obtains a possible benefit, equity raises a

presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption." (Pomeroy's Eq. Jur. § 956.)

As was said in *Tate* v. *Williamson* (L. R. [2 Ch. App.] 55, 60) : " Wherever two persons stand in such a relation, that while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed."

Whether the theory of the referee, as indicated in his main findings, which apparently rest on actual fraud, be adopted, or that resting upon the findings made at the request of the defendant, which apparently was constructive fraud, in either event the fraud entitled the plaintiff to relief against the entire contract. (Beach Eq. Jur. § 73.) The agreement was entire, made upon one occasion and upon a single consideration, so far as there was any. There was but one assent to all its terms, and the minds of the parties met at the same instant as to all its parts. It is impossible to say that the plaintiff would have assented to any part unless he assented to all. The parties did not make three independent agreements. They made but one which embraced three points, all relating to the same subject. If the false statement blotted out one, it blotted out all, for the whole arrangement was tainted with the vice of concealment and misrepresentation. An entire contract, although it may cover several different heads, must stand or fall as one indivisible thing. The referee did not find that the false statement affected only that part of the agreement which related to depreciation, but, on the contrary, he found that the entire contract was made by the plaintiff in reliance upon that statement. As was held in *Clermont* v. *Tasburgh* (1 J. & W. 112) : " The effect of partial misrepre-

sentation is not to alter or modify the agreement *pro tanto*, but to destroy it entirely and to operate as a personal bar to the party who has practiced it." So in *Rawlins* v. *Wickham* (3 De G. & J. 304, 322) the court said : " If a contract is obtained by fraud, it is for the party defrauded to elect whether he will be bound. He, perhaps, would not have entered into the contract at all if he had known the real facts ; it is, therefore, impossible with any degree of justice to enforce the contract against him in any part. * * * It has, therefore, been rightly settled that the party deceived has a right to have the contract wholly set aside." We think the agreement should stand or fall as a whole, and that one section cannot be set aside and the remainder enforced.

. There was no acquiescence, for there was no delay after discovery of the fraud, and delay will not " prejudice a defrauded party as long as he was ignorant of the fraud." (Pomeroy Eq. Jur. § 965.)

It is, however, insisted that the plaintiff is not entitled to relief, because the defendant cannot be completely restored to the position he occupied when the agreement was made. In other words, as he could have ended the partnership before he entered into the agreement, and he did not end it after he entered into the agreement, it is claimed that it is too late to relieve the plaintiff from the consequences of the fraud practiced upon him. The weakness of this position is that the defendant was not obliged to continue the business a single day after the agreement was made. He continued it because he wanted to, not because he had to, until the plaintiff himself dissolved the partnership. He reserved the right to terminate it at will, and because he did not exercise that right and the firm has since sustained losses, the plaintiff is not left without a remedy. The defendant knew all the time, and the plaintiff knew none of the time, that the representation was untrue, and, under these circumstances, the former continued the business at his peril. (Bigelow on Fraud, 430.) " If the wrongdoer has by his own act complicated the case so that full restoration cannot be made, he has but himself to blame."

(*Hammond* v. *Pennock*, 61 N. Y. 145, 152, citing *Masson* v. *Bovet*, 1 Den. 69.)

When, without fault on the part of the one defrauded, seeking relief in equity on account of advantage taken of fiduciary relations, it is impossible to restore the one guilty of the fraud to his original condition, the general rule of restoration is not strictly applied, because it would become a loophole for the escape of fraud. Equity makes a reasonable application of the rule by requiring whatever fair dealing requires under all the circumstances of the particular case, but it does not permit the rule to become a shield for wrongdoing.

We close the discussion by announcing as our conclusion that, upon the facts as found by the referee, the agreement in question should have been wholly set aside.

As we find no other error in the record, and the facts were fully and correctly found, a reversal of the judgment is not essential. We are urged by the learned counsel for the respondent to correct any error that we may find " by modification and reduction without incurring the vast expense of a new trial and the peril involved in loss of the security on appeal." So the learned counsel for the appellant asks us to reverse the judgment so far as to correct the errors of the referee in respect to three questions, two of which we have decided against him and one in his favor. We think that justice will be promoted by a conditional reversal, and accordingly we adjudge that the judgment should be reversed and a new trial granted, with costs to abide the event, unless the defendant stipulates to deduct from his judgment an amount equal to the reduction in rent and losses according to the agreement of January, 1889, and in that event the judgment should be modified accordingly, and as thus modified affirmed, without costs in this court to either party. The order, if not agreed upon, to be settled by the judge who wrote the opinion.

All concur, except PARKER, Ch. J., not sitting, and O'BRIEN, J., not voting.

Judgment accordingly.