## Gilliam v. Spillman Motor Company, et al.

(Decided May 27, 1927.)

### Appeal from Warren Circuit Court.

1. Partnership.—Plaintiff held entitled to cancellation of contract under which he secured interest in partnership business where defendants failed to disclose overdrafts and mortgage.

2. Partnership.—Rule requiring proof of actual fraud in order to authorize cancellation of written instrument attacked on that ground does not apply to action for cancellation of contract for purchase of partnership interest, since each agent of member of partnership owes highest degree of loyalty and fidelity, and buyer enters association based on mutual confidence.

W. B. GAINES, STOUT & HERDMAN and O. P. ROPER for appellant.

RODES & HARLIN for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing.

On the 10th of June, 1926, S. B. Gilliam by parol contract purchased of R. P. Spillman and G. P. Dixon a one-third interest in the Spillman Motor Company, paying therefor $5,500.00 in cash. The business was conducted as a partnership. Both Spillman and Dixon received salaries, and it was understood that Gilliam would devote his time to the business and be paid for his services. In the next few days the firm required financing, and Gilliam advanced to it his personal checks for $1,472.00 and $1,836, accepting its notes therefor. Upon further investigation he became dissatisfied with the purchase and on the first day of July sued the company and the sellers for a cancellation and rescission of the contract and a recovery of the money loaned; it being alleged in the petition that in negotiating the sale the sellers misrepresented both the assets and liabilities of the firm. In the alternative he sought a dissolution of the partnership and a re-

covery of the money advanced it. A general order of attachment was also issued and levied on the firm's property. The defendant traversed the allegations of the petition and executed bond to perform the judgment of the court, releasing the attachment. Upon motion the court required the plaintiff to elect whether he would rely upon his action for a rescission of the contract or for a dissolution of the partnership, and he elected to prosecute the former action. Whereupon so much of the cause of action as sought a dissolution of the partnership was dismissed. Upon proof heard the court refused a cancellation, but entered a decree of dissolution and judgment in favor of plaintiff for his debts. Plaintiff appeals from the judgment denying rescission, and defendants prosecute a cross-appeal from that part of a decree granting the dissolution.

Gilliam testifies that he had known Spillman for several years and had some business dealings with him and relied upon him implicitly; that Spillman had at different times proposed to him to purchase an interest in the business, and on the day of the sale came to his business house and made him a proposition. He got in the car with Spillman and drove to the garage where he met Dixon, Most of his conversation was with Spillman, who told him that the stock and accessories were of the value of $20,000.00; that the storage on the machines more than paid the rent of the garage; and that the company was making $25,000.00 a year and had made over $5,000.00 during that year up to that period. He asked about the indebtedness of the company, and Spillman told him that it owed tbout $2,000.00, not exceeding $2,300.00, and the amount due it on account would easily offset its indebtedness. Dixon showed him the stock on hand and made the same representations as to its value. No other indebtedness was mentioned to him, although he asked particularly about this. An overdraft of $1,400.00 developed a few days later; it was explained that this was due to a failure in collections, and he gave the firm his individual check for $1,472.00, taking its note therefor. Together with Spillman he purchased some supplies at a bankrupt sale amounting to $447.00. He wanted to pay this bill and found the firm again overdrawn to the extent of $1,200.00, and to cover these items on the 18th of June gave it his check for $1,836.00, for which it executed a note to

him. Shortly afterward he learned the firm was indebted to the American National Bank in the sum of $1,800.00, and objected. Spillman asserted that he had told him of this at the time of the making of the trade, and some words arose. Later Spillman recited the trade in the presence of another witness, but without referring to the overdraft. Gilliam went to see Dixon, who was ill at his home, and Dixon gave him a signed statement reading:

"As the trade was made between C. P. Dixon, Dee Spillman, and S. B. Gilliam, S. B. Gilliam purchased one-third interest in the Spillman Motor Company with the understanding that the outstanding debts was not to exceed over 2,300 and acts notes & etc due the firm was around 2,000 and there was a note at the bank for 1,800 I mention myself this is the way I remember the trade."

He made further inquiries and discovered a floor mortgage aggregating $5,100.00 on seven new machines then in the garage, and a further discovery that there was a mortgage on his partners' interest in the garage to the American National Bank for $8,000.00. That liability occurred in this way: In March previous, Spillman, who at that time owned the entire garage, sold to Dixon and one Speight a two-thirds interest in the business for $10,000. $2,000.00 of this was paid to Spillman in cash and a note for $8,000.00 was executed to him by Speight and Dixon, secured by a mortgage on their interest in the partnership. Spillman indorsed and negotiated this note to the bank in exchange for some notes he owed it. This mortgage was executed in March, and the bank had it recorded after Gilliam's purchase. A short time prior to the purchase Speight withdrew from the firm. He was paid $1,000.00, and the firm assumed his obligation on the note. Spillman later applied $4,000.00 of the amount paid by Gilliam as a credit on that note, leaving a balance of $4,000.00, secured by a lien on two-thirds of the partnership.

Spillman and Dixon testify that the stock consisted of new and second-hand machines and accessories and regular garage and office equipment; that it was worth in excess of $20,000.00; that they offered to have an inventory taken, but that Gilliam did not desire that done; that they were paying $255.00 a month rent for the garage, which had the largest storage space of any building of

that character in Bowling Green, and that the storage did more than pay the rent; that they did have a large service department and the facts and circumstances as relating thereto were as stated to Gilliam. They specifically deny that they told him it was making $25,000.00 a year, or had made $5,000.00 during the months of 1926. Each testifies that Gilliam asked about the indebtedness and that Spillman told him it was something around $2,000.00 or $2,300.00 on open accounts, and the accounts due them would equal $2,000.00; that they also informed him of the note of $1,800.00 due the bank, and, while they may not have mentioned the floor mortgage, they did tell him that they only had an equity in the new cars which were on sale; that upon purchase of the new cars they paid around 20 per cent. of the purchase price and owed the remainder; that on the seven cars this equity was worth $1,000.00 or $1,200.00; that upon the sale of each car the balance of the purchase price was paid and they retained the profit and the equity; and that only the value of the equity was included in the estimated value of the stock. In a vague way they claim that he was informed of the overdraft, though each says that the other gave him the information.

Spillman testifies thus:

"Q. Did you tell him that the Spillman Motor Company owed something over $1,400.00 on an overdraft? A. I did not tell him, but Mr. Dixon told him that over in the garage while we were making the trade.

"Q. Isn't it a fact that it has been testified to here by you or Dixon that you did not know about that at the time yourselves? A. I don't know; I don't think so.

"Q. You didn't testify, and you say that you did not know about this overdraft at the time? A. I didn't know it, but Mr. Dixon did and told him about it."

Mr. Dixon testifies:

"Q. Did you tell him about the overdraft that was owing? A. No; Mr. Spillman told him that he thought we were overchecked at the bank about $1,200.00 or $1,300.00.

"Q. Mr. Spillman says that you told him; did you tell him? A. I know that one of us told him."

On second examination Dixon was again asked:

"Q. Did you tell him about the overdraft at the bank? A. I did not know it at the time.

"Q. Did you hear Mr. Spillman tell him anything about it? A. I am not positive whether I heard anything about it or not.

"Q. If you had heard it you would recall it wouldn't you? A. Those things get mixed up, but I heard him tell him three or four days after that trade was made about it. . . .

"Q. Didn't you say that you looked after that part of the business? A. Yes, sir.

"Q. Didn't you know that the firm was overdrafted? A. No, sir."

Patterson, the bookkeeper, testified as to the condition at the time of the trade:

"Q. Do you know how much outstanding indebtedness there was at the time? A. Well, I know practically; I don't know exactly; it was between $3,000.00 and $3,100.00. I don't know exactly.

"Q. You mean debts? A. Yes; that is the bills they owed out of town.

"Q. Now, then, the $3,000.00 out of town; how much was in town? A. I have forgotten; I think we owed $400.00 or $500.00 in little bills, but I wouldn't be positive."

He also testifies that he thinks the bank account was about even, that they were not overdrawn so far as he knew. Appellees took an invoice in the November following which shows the value of the stock then on hand, including new machines on the floor plan, to be $20,872.00; the notes, accounts, etc., $5,057.31, or total assets of $25,-929.47; and a total indebtedness of $9,983.07, including the mortgage of machines held on the floor plan, leaving net resources of near $16,000.00. Appellant had nothing to do with this invoice, and it is shown to be inaccurate in several particulars, and some of the items to have been so grossly overpriced as to impeach its value for any purpose. In briefs of counsel it is stated that it later sold at decretal sale for a nominal sum, but this does not appear in the record; and without reference to it, it may be said that the record is convincing that the value is much below

the sum fixed by appellants. Summarizing this evidence, it is admitted that the current indebtedness was fixed at $2,300.00, and we are forced to the conclusion that no mention was made of the overdraft. As admitted by Patterson, such indebtedness aggregated $3,500.00. If the overdraft was included in this admission the sellers failed to disclose $1,200.00. If it was not included in the $3,500 there was a failure to disclose $2,400.00 of indebtedness, independent of lien debts. There is also some doubt as to whether appellant was informed of the $1,836.00 lien debt to the bank. Dixon says that Spillman told him of this. Spillman says that Dixon told him. Gilliam denies that either mentioned it; but it is admitted by all that they did not inform him of the $8,000.00 lien debt due the bank and secured by mortgage on two-thirds of the partnership effects. While not a firm debt the obligors' interest in the firm was put in lien. Apparently the note was due July 11th. At its option the bank could then sue the obligors thereon at any time and cause a dissolution of the firm. It is not probable that a business man would want to take an interest in a venture of such uncertain duration. At any rate it was a material fact affecting the firm's standing. Assuming that the appellees explained that they only claimed an equity in the new cars and that they were thus relieved from discharging the floor mortgage of $5,100.00 and that they disclosed the $1,836.00 lien note to the bank, they mere nevertheless derelict in not disclosing the overdraft and the mortgage for $8,000.00 mentioned above.

These matters, when taken in connection with the uncertain value of the stock, constituted such a suppression of material facts as authorized Gilliam to a concellation of the contract. The rule of law requiring proof of actual fraud in order to authorize the cancellation of a written instrument attacked on that ground does not apply to cases of this character. One who buys into a partnership enters an association based on mutual confidence. Each a member of the firm is its agent and owes it the highest degree of loyalty and fidelity. He also owes to his associates the utmost good faith and candor, and this relates back to the negotiations for purchase. In assuming such relationship the purchaser is entitled to know all the facts. As a future partner it is the duty of the seller to candidly answer his inquiries. If he fails

in this respect and conceals any material fact about which he is asked, the purchaser may have relief even though the seller was guilty of no actual fraud. This rule is thus stated in Rankin v. Kelly, 163 Ky. 465, 173 S. W. 1152:

"There is no relation of trust or confidence known to the law that requires of the parties a higher degree of good faith than that of a partnership. This obligation of partners to exercise the utmost good faith towards each other applies not only during the life of the partnership, but extends to their settlements and dealings while negotiating for the formation of the partnership, as well as for the purchase or sale of a partner's share in the business. 30 Cyc. 438. Purchases by one partner of his copartner's interest in the firm are of frequent occurrence, and when made in good faith operated to vest the ownership of firm property in the purchasing partner. 30 Cyc. 456; Taylor v. Ford, 131 Cal. 440, 63 P. 770. Where, however, through mutual mistake, the amount of liability assumed by the outstanding partner is largely in excess of the estimated amount the sale may be avoided. Mussetter v. Timmerman, 11 Colo. 201, 17 P. 501 (504); Maxfield v. Seabury, 75 Minn. 93, 77 N. W. 555; Erhmann v. Stitzel, 121 Ky. 751 (90 S. W. 275, 28 Ky. Law Rep. 728, 123 Am. St. Rep. 224.) The transaction may also be avoided not only for actual fraud, but for violation of that high degree of good faith and fair dealing which the law requires of the partners in their transactions with each other. Meyers v. Merillion, 118 Cal. 352, 50 P. 662; Powell v. Cash, 54 N. J. Eq. 218, 34 A. 131, affirmed in 55 N. J. Eq. 826, 41 A. 1115; Butler v. Prentiss, 158 N. Y. 49 (52 N. E. 652). It is, therefore, held that where one party seeks to benefit himself at the expense of the firm of his copartner, he will be required to show not only that the law is on his side, but that his conduct conforms to the high standard of honor required by the partnership relation. To secure an avoidance, therefore, misrepresentation by the benefited partner is not necessary. Where one of the partners, having the active control of the business, secures an advantage by means of concealment, the purchase will be held coid. Brooks v. Martin, 2 Wall.

(69 U. S.) 70, 17 L. Ed. 732; Pomeroy's Eq. Jur. sections 891-902; Lee's Adm'r v. Reed, 4 Dana, 109."

As appellant was entitled to a cancellation of the contract and a recovery of the purchase money he had paid as well as the money he had loaned the firm, he is in no wise interested in the later action of the court in ordering a dissolution of the partnership.

Wherefore the case is reversed on the original appeal at appellees' cost. It is also reversed on the cross-appeal at appellees' cost.

Judge Logan not sitting.