## Detroit Fidelity & Surety Company v. Gilliam et al.

## Gilliam v. Hines et al.

(Decided January 23, 1931.)

(As Modified on Denial of Rehearing March 20, 1931.)

426

WM. MARSHALL BULLITT, LEO T. WOLFORD, and BRUCE & BULLITT and ROBT. M. COLEMAN, JR., for appellant Detroit Fidelity & Surety Co.

STOUT & HERDMAN for appellant Gilliam.

RODES & HARLIN, THOMAS & LOGAN, T. W. THOMAS, and G. D. MILLIKEN for appellees Hines and others.

OPINION OF THE COURT BY JUDGE DIETZMAN.—Affirming.

This appeal is an aftermath of the litigation involved in the case of Gilliam v. Spillman Motor Co., 220 Ky. 264, 294 S. W. 1090. As appears from that case, Gilliam, on

the 10th day of June, 1926, purchased a one-third interest in the Spillman Motor Company, a copartnership, paying therefor $5,500 in cash. He thereafter advanced the company $3,308 on July 1st following. Having become dissatisfied with his purchase, he sued for a cancellation and rescission of the contract and a recovery of the money loaned. In the alternative, he sought a dissolution of the partnership and a recovery of the money advanced it. A general order of attachment was issued and levied on the firm's property. The motor company executed bond to perform the judgment of the court, thereby obtaining a release of the attachment. On final hearing, the lower court refused a cancellation, but entered a decree of dissolution and a judgment in favor of Gilliam for the money he had advanced the firm. Both parties appealed from the judgment. This court held that Gilliam was entitled to a cancellation of the contract and a recovery of the purchase money he had paid as well as the money he had loaned the firm, which, being true, he was in no wise interested in any dissolution of the partnership. On return to the circuit court, the mandate of this court was filed and judgment entered in accordance therewith. The present litigation grows out of the effort of Gilliam to recover on the bond which was executed to perform the judgment of the court and which had the effect of releasing the attachment. The facts concerning the execution of this bond are these: When Gilliam first filed his suit against the Spillman Motor Company and procured his order of attachment, which was duly levied on the property of the Spillman Motor Company, this company executed a bond pursuant to section 221 of the Civil Code of Practice to perform the judgment of the court with the appellant Detroit Fidelity & Surety Company as surety on the bond. This bond was executed for this surety company by its resident agent in Bowling Green, Mr. T. T. Gardner. On the execution of the bond. Gardner notified his principal at its main office in Detroit, Mich., of what he had done. On receipt of such notification, the surety company wired Gardner as follows:

"Detroit, Mich. July 12, 1926.

"Grider Gardner and Company, 11 Price Building, Bowling Green, Ky.

"Execution Spillman Motor Company bond exceeds your authority stop arrange for cash collateral or release of bond.

"Detroit Fidelity and Surety Company."

The surety company followed this telegram up with the following letter:

"July 12, 1926.

"Grider and Gardner 11 Price Building, Bowling Green, Ky.

"Re: Spillman Motor Company

"Gentlemen: I am sending herewith confirmation of our telegram dispatched to you concerning the execution of a bond on behalf of the Spillman Motor Company, etc. to discharge an attachment granted to S. B. Gilliam.

"Reference to Section No. 9 of your letter of instructions dated December 26, 1923, will clearly show that you are not authorized to execute bonds of this character unless they are first specifically authorized by the home office.

"If it is impossible to secure collateral in the form of cash or its equivalent, then we shall expect you to secure the discharge of our bond, which perhaps may be accomplished by the substitution of another bond.

"Since you have acted beyond your authority we shall have to expect you to be personally liable for any loss which may be sustained."

When this letter and telegram were received by Gardner, the Warren circuit court in which Gilliam's suit had been filed was in vacation. Gardner at once got in touch with the members of the partnership composing the Spillman Motor Company and communicated to them the demands of the surety company. The Spillman Motor Company thereupon procured W. T. Hines, Ernest Daughtry, Henry Giles, Eldon Stone, and G. B. Dixon, appellees, herein, and to whom we shall hereafter refer for the sake of brevity as the individual sureties, to go before the clerk of the Warren circuit court and become sureties on another bond to perform the judgment of the court then executed before such clerk by the motor company. The individual sureties at the time they became sureties on this second bond were not aware that a like bond had theretofore been executed with the appellant surety company as surety thereon. Upon the execution of this second bond, the clerk on his own initiative gave to Gardner the bond which he had theretofore signed for

the surety company, and it was thereafter either destroyed or sent by Gardner to the surety company.

Returning now to the suit of Gilliam v. Spillman Motor Company, we find that, while that suit was pending in the circuit court, the court ordered a sale of the property of the motor company. At this sale, held on January 3, 1927, one John Ross became the purchaser at the price of $13,000. The master commissioner made a report of the sale to the Warren circuit court, which was, in course of time, confirmed. Ross failing to execute the sale bonds and in fact leaving the jurisdiction of the court so that he could never be found, the court ordered a resale of the property which was had on January 24, 1927. At the resale, the property brought $6,604.50, which was paid into court to await orders of distribution. Before this second sale was confirmed, however, exceptions were filed to it on the theory that Gilliam was in truth the purchaser at the first sale, Ross having really acted as his agent and Gilliam being an undisclosed principal. It was sought to fasten liability for this first sale upon Gilliam. But after hearing proof, the court overruled the exceptions and confirmed the sale. After Gilliam's litigation with the Spillman Motor Company had been ended by the filing of the mandate of this court in the circuit court and the entry of the judgment therein in accordance with that mandate, Gilliam brought this suit against the individual sureties to recover on the bond executed by them to perform the judgment of the court in the motor company suit and to set aside certain conveyances made by these individual sureties of their property on the ground that such conveyances were fraudulent as such are denounced by section 1906 of the Kentucky Statutes. This suit had not progressed very far before Gilliam made the surety company a party defendant, seeking judgment against it on the bond executed by it to perform the judgment of the court in the motor company suit. The surety company defended on the grounds, first, that the bond which its agent had purported to execute on its behalf was not its act, as he had in executing the bond exceded his authority; secondly, that in any event the bond which its agent had purported to execute for it had been discharged by the execution of the bond by the individual sureties; and, thirdly, that the plaintiff Gilliam was in court with unclean hands. Consistently throughout its pleadings, the surety company denied, as

Gilliam claimed, that the bond executed by the individual sureties had been executed by them as sureties additional to the suretyship of the surety company or to indemnify the surety company. The individual sureties contended that the bond which they executed was not binding upon them because it was executed without consideration, and because the circuit clerk had no authority to take the bond after he had already taken the one with the surety company as surety. They denied that the conveyances they had made and which were attacked in the petition were fraudulent. In subsequent pleadings both the surety company and the individual sureties endeavored to compel Gilliam to exhaust his rights against the fund in court arising out of the sale of the assets of the Spillman Motor Company and to which there were a number of claimants as well as Gilliam. It further appears from amended pleadings filed in this record that, pending this litigation, a suit was brought under section 518 of the Civil Code of Practice to set aside the confirmation of the sale of the assets of the motor company to John Ross because of newly discovered evidence to establish the fact that Gilliam was the real purchaser at that sale as an undisclosed principal through Ross as his agent. On final hearing of the instant case, the court dismissed the petition of Gilliam against the individual sureties and gave Gilliam a judgment against the surety company for the amount of his judgment against the Spillman Motor Company, but provided that Gilliam should credit this judgment against the surety company by any amount he had or should recover out of the fund in court arising out of the sale of the assets of the Spillman Motor Company. The court also refused the surety company any relief against the individual sureties. From that judgment the surety company has appealed, and Gilliam has appealed, seeking to reverse the judgment in so far as it dismissed his petition against the individual sureties.

The first question presented for decision is, Was the surety company bound on the bond executed on its behalf by its agent Gardner? Relying on the provisions of section 482 of the Kentucky Statutes, the power of attorney which it had executed authorizing its agent Gardner to execute bonds for it and which was recorded in the county clerk's office, and further relying on a letter of instructions sent by it to its agent Gardner at the time he was appointed its agent in Bowling Green, the surety com-

pany contends that Gardner had no authority to execute the bond in question, it being one essentially to release an attachment, and it being, as the surety company claims, an open one, whereas in no event could he execute a bond exceeding $25,000 in its penal sum. We do not find it necessary to discuss these contentions advanced by the surety company, because, by its telegram and letter sent to its agent on receipt of the information that this bond had been executed, it ratified the execution of the bond by its agent. The surety company with full knowledge of all the facts did not repudiate the act of his agent in executing the bond or take the position that it was not bound by it. On the contrary, it insisted that its agent secure collateral security for its undertaking, or, failing this, a discharge of the bond in question. Such a stand is utterly inconsistent with any contention that the surety company did not recognize that it was bound by the bond executed. In Mechem on Agency (2d Ed.) sec. 471, in discussing the topic of ratification by acquiescence coupled with conduct inconsistent with disapproval, the author writes:

"These cases, from their infinite variety of facts, do not lend themselves readily to any precise rule. 'It is sufficient to say that a ratification will be implied from the conduct of the person, in whose behalf another has assumed to act, clearly inconsistent with any intention other than a purpose to adopt such act as his own.' (Oberne v. Burke, 50 Neb. 764 [70 N. W. 387]. And other cases cited in the note.) The cases in which this principle has been applied are very numerous, but a few of them are given here as illustrations of its nature and effect. . . . So where an agent without authority made a contract for the sale of land and notified his principal of the fact, saying that he would also send a deed for execution which he did some days later, and the principal made no objection, acknowledged the receipt of the papers and said that he would return them as soon as his attorney had examined them, it was held that there was such evidence of ratification as would sustain the sale as against a later repudiation. (Dana v. Turlay, 38 Minn. 106 [35 N. W. 860]; and other cases cited in the note.) Again, where a note had been indorsed without authority, but the principal afterwards wrote over the indorsement a waiver of

demand and protest, it was held that he had sufficiently adopted the indorsement. (Allin v. Williams, 97 Cal. 403 [32 P. 441]; and other cases cited in the note.) . . . And where the president of a railroad company, without authority, made a sale of property belonging to the company, in part payment of a debt owed by it, and the fact of the sale was communicated to the board of directors and talked over publicly at one of their meetings, but they did nothing to disaffirm it, it was held to be ratified. (Walworth County Bank v. Farmers', etc., Co., 16 Wis. 629.) And where, after an accident, a conductor employed a physician to care for an injured person and both the conductor and the physician notified the general superintendent of such employment, but the company gave no notice of dissent, it was held that the employment was ratified. (Terre Haute, etc., R. Co. v. Stockwell, 118 Ind. 98 [20 N. E. 650].) And where an agent without authority procured work to be done, and the principal on receiving the bill objected to the amount of the charge but not to work or the authority to procure it, it was held that ratification might be inferred. (Hill v. Coates, 34 Misc. Rep. 535 [69 N. Y. S. 964].)''

In 21 R. C. L. 927, we find:

''Ratification of the unauthorized acts of one assuming to act as agent may be either express or' implied; express, as by spoken or written words; implied, when the conduct of the principal constitutes an assent to the acts in question. And the acts of the principal, it seems, will be liberally construed in favor of a ratification.''

On receipt of the telegram and letter from his principal, Gardner communicated their contents to the Spillman Motor Company, and it was in an effort to comply with the demand of the surety company that the second bond was executed, the motor company being unable or unwilling to put up collateral security. Under the facts of this case, the surety company not only did not repudiate the act of its agent in executing the bond, but clearly ratified it by requiring its agent to secure collateral security or a discharge of the bond. Hence the surety company cannot now escape liability on the ground that the bond was executed without authority.

The next question we have to determine is whether or not the execution of the bond by the individual sureties discharged the bond theretofore executed by the surety company, and, if not, is the surety company entitled to contribution or indemnity from the individual sureties? The last question may be summarily disposed of, because, as we have seen, the surety company throughout its pleadings has taken the position that the second bond operated as a discharge of the first bond and has never sought contribution or indemnity. But did the execution of the second bond operate as a discharge of the first? Conceding, but expressly not deciding, that a clerk of the court can on his own initiative take a bond in accordance with the provisions of section 221 of the Civil Code of Practice where a bond theretofore taken by him under such section is defective, cf. Civil Code of Practice, sec. 682, yet in the instant case we find no such state of case presented. It is not suggested that there was any defect in form or substance in the bond executed by the surety company. And, as the surety company was bound upon it at the time the individual sureties executed the second bond, there was no state of case presented which authorized the clerk under section 682 of the Civil Code of Practice to take a second bond, even if it be conceded, as appellant argues must be done, that the clerk could, in the absence of a judicial decision that the bond already taken was defective, take a second bond to replace the defective one.

Appellant argues, however, that, though informal, what was done here was, in effect, the releasing of a surety in accordance with the provisions of section 4659 et seq. of the Statutes, which provide for the release and indemnity of sureties.

At the outset of its argument to support this contention, appellant says: ''It goes without saying that the statute applies to a bond under section 221 of the Civil Code of Practice to perform the judgment of the court.'' Appellant has thus summarily assumed the major premises of its syllogism. Is it warranted in such an assumption? No doubt, it bases that assumption on the language of section 4659 of the Statutes which, in setting out what bonds a surety can procure a release from, says: ''Or in any bond or covenant which by law may be required to be executed in court, or before an officer at the commencement or during the progress of any civil judi-

cial proceeding.'' This section of the Statutes standing alone perhaps might warrant the assumption appellant makes. But this section must be read in connection with the other sections of this act providing for the release and indemnity of sureties. These sections, in substance, provide that, after a proceeding has been initiated by a surety to procure his release as such, the principal may execute a new bond which, under the statute, has the effect of discharging the surety from future liability on the old bond, or, if the principal refuse, the court before whom the motion of the surety for release is made may remove the principal from his office or fiduciary position, the court making all needful orders for the protection of the estate theretofore confided to the fiduciary and for the protection of the surety. This is all the court can do. Now where a defendant in an attachment proceeding has pursuant to section 221 of the Civil Code of Practice executed a bond to perform the judgment of the court, which bond, on being executed, releases the attachment and restores the possession of the property to the attached defendant, and thereafter his surety on the attachment bond undertakes to be released from further liability, and its principal, the attached defendant, declines to give a new bond, what can the court do? It cannot remove the attached defendant from any office; it cannot abate the suit against him; it cannot force a new bond. A reinstatement of the attachment would, if in any instance the property could be found to be seized again, in most cases be disastrous to the attaching creditor due to the depreciation in the attached assets, and due to the fact that he would be put to the chance of making the amount of his judgment out of those assets at a time when market conditions might not permit of it, whereas, under the bond, he would, if the surety be solvent, be sure of his judgment, no matter when finally secured. It is not to be presumed that the Legislature by this act intended to cover a situation where the court would be helpless to give relief. Reading the act as an entirety, we are forced to conclude that the Legislature meant to give to sureties a right to obtain release from future liability only in those cases where the court could, if the principal refuse to give a new bond, in all cases protect the status quo. This the court cannot do in case of a bond executed pursuant to section 221 of the Civil Code of Practice, and we are therefore of the opinion, that sections of the Statutes providing for the release

and indemnity of sureties have no application to the state of case presented by this record. Hence the surety company was not released by reason of the execution of the second bond.

It follows that Gilliam is not entitled either to recover on the bond of the individual sureties as it was executed without consideration. When the first bond was executed herein, the levy of the attachment was discharged, and the property attached released. That was, so far as the principal and surety on the bond were concerned, the whole purpose of the bond. The execution of the second bond worked no detriment to the obligee therein, nor any benefit to the obligors. Gilliam could not, at least in the absence of some pleading raising the amount sought to be recovered, have obtained any further orders of attachment. But a bond such as here executed by the individual sureties would not in advance of such amendment prevent the issuing of attachments on such amended pleadings. Under the bond of the surety company, Gilliam was protected at least in the payment of any judgment his pleadings then authorized. Once the bond under section 221 of the Civil Code of Practice is properly executed, the attachment itself is discharged and disappears. As we have seen, the execution of the second bond did not work a discharge of the first bond. Hence it follows that, being without consideration, the bond signed by the individual sureties never obligated them, and the lower court did not err in declining to award Gilliam any relief upon it.

The surety company complains that the court's judgment in this case was not authorized because it should have waited until it was determined what part, if any, of the assets of the Spillman Motor Company, Gilliam would recover, and indeed whether he should not be charged with the full amount of the first sale of those assets as the undisclosed principal of Ross. But whatever Gilliam got out of the Spillman Motor Company's assets, the amount depending in part on whether he was charged with the first sale or not, could operate only by way of a counterclaim and/or offset on behalf of the surety company. The judgment specifically recited that Gilliam was to credit the judgment in the instant case by whatever he should recover out of the fund in court arising out of the sale of the assets of the Spillman Motor Company. Gilliam is not complaining of this aspect of the judgment, and clearly under the terms of

436

this judgment he cannot enforce it against the surety company until he has obtained whatever he is entitled to from the assets of the Spillman Motor Company. When he undertakes to make this credit on his judgment, the surety company can then raise any question it wishes as to the adequacy of such credit, it not being precluded by what the court did in the distribution of the Spillman Motor Company assets.

The judgment of the trial court in each appeal is affirmed.

Whole court sitting, with the exception of Chief Justice LOGAN, who took no part in the decision of this case.