**SAINT JOSEPH HEALTHCARE, INC. (d/b/a Saint Joseph Hospital), Appellant**

v.

**Larry O'Neil THOMAS (as Administrator of the Estate of James "Milford" Gray, Deceased), et al, Appellees**

2014–SC–000008–DG

Supreme Court of Kentucky.

RENDERED: MAY 5, 2016

---

**20.** The motion to strike portions of Appellee's brief is Denied.

COUNSEL FOR APPELLANT: Robert Franklin Duncan, Jay Edward Ingle, Patrick F. Estill, Jackson 85 Kelly, PLLC, 175 East Main St., Suite 500, Lexington KY 40507

COUNSEL FOR APPELLEES: William R. Garmer, Garmer And Prather, PLLC, Darryl Lamont Lewis, Searcy Denney Scarola Barnhart &Shipley, PA, Charles Albert Grundy, Grundy Law Group, Elizabeth R. Seif, Decamp Talbott Seif P.S.C.

## OPINION OF THE COURT BY JUSTICE VENTERS

Appellant, Saint Joseph Healthcare, Inc. d/b/a Saint Joseph Hospital (the Hospital), appeals from an opinion of the Court of Appeals that affirmed a Fayette Circuit Court judgment awarding $1,450,000.00 in punitive damages to Larry O'Neil Thomas, Executor of the Estate of James Milford Gray and Gray's statutory survivors (collectively "the Estate"). The award was based upon a jury verdict finding that the Hospital had engaged in gross negligence in its treatment of Gray following two visits to the Hospital's emergency room.[1] As grounds for relief, the Hospital raises the

---

1. As explained below, the jury that returned the verdict under review was the second jury to award significant punitive damages in this matter.

following arguments: (1) the trial court erred in failing to grant a directed verdict on the Estate's claim for punitive damages; (2) the evidence failed to establish that the Hospital ratified its staffs misconduct so as to authorize an award of punitive damages against it pursuant to KRS 411.184(3); (3) the jury instructions provided for the Hospital's liability based upon tortious conduct of the independent contractor physicians engaged to provide emergency room services; (4) the punitive damage award was excessive and violated the Due Process provisions of the Fourteenth Amendment; and (5) the trial court's failure to dismiss a sleeping juror deprived the Hospital of a fair trial. For the reasons stated below, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The sufficiency of the evidence and the inferences that may reasonably be drawn from it were vigorously contested in this action. Upon appellate review, we are constrained to view the sufficiency of the evidence in the light most favorable to the verdict. The prevailing party is entitled to all reasonable inferences which may be drawn from the evidence. *Lewis v. Bledsoe Surface Mining Company,* 798 S.W.2d 459, 461 (Ky.1990) (citing *Kentucky & Indiana Terminal R. Co. v. Cantrell,* 298 Ky. 743, 184 S.W.2d 111 (1944) and *Cochran v. Downing,* 247 S.W.2d 228 (Ky. 1952)). Viewed accordingly, the evidence at trial established the following facts.

At 8:08 p.m. on April 8, 1999, thirty-nine year old James Milford Gray, an uninsured and indigent paraplegic, arrived at the Hospital's emergency room complaining of extreme abdominal pain, nausea, vomiting, and severe constipation. He was examined by Dr. Barry Parsley and Physician's Assistant (PA) Julia Adkins. Gray was in extreme pain and great distress during this visit to the Hospital. A witness acquainted with Gray testified that he heard Gray crying, complaining of extreme stomach pain, and calling for help. An Xray technician at the Hospital testified that Gray's severe agony made it difficult to obtain a suitable x-ray image of him. During his initial visit to the Hospital, Gray was treated with pain medication, an enema, and manual disimpaction of his colon to alleviate his constipation.

At 12:40 a.m. on April 9, four-and-a-half hours after his arrival, Gray was discharged from the Hospital. Without designating a specific destination, the Hospital arranged for Rural Metro Ambulance Service to transport Gray away from the premises. The ambulance team took Gray to the homes of various family members, including the home of his niece, Chesity Roberts, where Gray had recently resided.

Roberts testified that when the ambulance brought Gray to her home, his face was ashen, his lips were white, and he was moaning in pain. Given his gravely ill appearance, Roberts declined to accept him because she was not able to provide the care he needed. Other family members responded in like manner. Unable to find a suitable caretaker for Gray, the ambulance service took him back to the Hospital.

Upon his return to the Hospital, rather than re-admitting him to the emergency room and despite evidence of his continuing pain and distress, the hospital staff transported paraplegic Gray in a wheelchair to a motel across the street. They paid for his room and left him there without the wheelchair. After seeing him vomit dried blood, the motel staff became concerned about Gray's manifest illness. They called 911 for emergency medical service and at 5:25 a.m. on April 9, Gray was taken back to the Hospital emergency room.

Back in the emergency room, Gray was attended by Adkins and Dr. Parsley, and later by Dr. Jack Geren. Dr. Geren discharged Gray at 12:15 p.m. According to the evidence, Gray was warned that if he returned to the Hospital again he would be arrested. He was taken first to the home of his sister and then to the home of Chesity Roberts. Family members urged him to return to the Hospital but he refused to do so, expressing fear of being arrested. A few hours later, Gray died at Roberts' home.

An autopsy revealed that Gray suffered from duodenal peptic ulcer disease and that his death resulted from purulent peritonitis caused by the rupture of a duodenal ulcer. The autopsy identified constrictive atherosclerotic coronary artery disease as a contributing factor in Gray's death. It also disclosed the presence of unprescribed controlled substances in his system.

■ As administrator of Gray's Estate, Larry Thomas brought suit in the Fayette Circuit Court alleging medical negligence by the Hospital, Dr. Parsley, Dr. Geren, Julia Adkins, Dr. Richardson,[2] and three of the Hospital's emergency room nurses. The Estate also asserted a claim under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (EMTALA).[3] EMTALA places two basic duties upon a hospital when a patient is presented for treatment at its emergency room: (1) the hospital must screen the patient for medical care needs; and (2) the hospital must stabilize the patient before discharging him or transferring him.

This case has endured a tortuous course through the courts. The verdict now under review is the second jury verdict awarding punitive damages against the Hospital in this matter. After the Estate's claims against Drs. Richardson, Parsley, and Geren were settled, the case went to trial on the claims against the Hospital and its employees. The jury returned a verdict in favor of the Estate, assessing compensatory damages in the sum of $25,000.00. The jury allocated fault for Gray's death as follows: 25% to Gray; 30% to Dr. Parsley; 30% to Dr. Geren; and 15% to the Hospital. The Hospital's 15% of the compensatory award was $3,750.00. The jury also assessed $1,500,000.00 in punitive damages entirely against the Hospital.

The verdict was appealed. The Court of Appeals affirmed the award of compensatory damages, but based upon *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), it set aside the punitive damages as excessive and remanded the case for a new trial on punitive damages. The Court of Appeals reasoned that the great disparity between the Hospital's share of the compensatory damage award and the punitive damages assessed by the jury constituted a violation of the Fourteenth Amendment due process clause under *Gore*.

Thereafter, we granted review and remanded the case to the Court of Appeals for further consideration in light of the then recent EMTALA decision in *Martin v. Ohio County Hospital Corporation*, 295

---

2. Dr. Richardson treated Gray in the Hospital emergency room about a month prior to the traumatic visit of April 1999.

3. "The Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, enacted by Congress in 1986, is sometimes referred to as an 'anti-dumping' statute because its primary purpose is to prevent hospitals from 'dumping' patients who lack insurance or cannot pay for their claims, through refusing treatment or referring them to other hospitals." *Martin v. Ohio County Hospital Corporation*, 295 S.W.3d 104, 112 (Ky.2009) (citing *Thornton v. Southwest Detroit Hospital*, 895 F.2d 1131 (6th Cir.1990)).

S.W.3d 104, 112 (Ky.2009). After its reconsideration of the case, the Court of Appeals reaffirmed its original disposition, so the case went back to the circuit court to retry the punitive damages claim. On retrial, the jury again awarded punitive damages, this time in the amount $1,450,000.00. The Court of Appeals affirmed the award. We granted discretionary review and now affirm the decision of the Court of Appeals.

## II. THE EVIDENCE WAS SUFFICIENT TO SUPPORT AN AWARD OF PUNITIVE DAMAGES

The Hospital first argues that a directed verdict should have been granted dismissing the punitive damage claim because any deficiencies in the care and services provided to Gray did not rise to the level of "gross negligence," and that any award of punitive damages was flagrantly against the evidence. We disagree.

Damages recoverable for an EMTALA violation are determined by the application of state law. 42 U.S.C.A. § 1395dd provides:

Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, *obtain those damages available for personal injury under the law of the State in which the hospital is located*, and such equitable relief as is appropriate.

(Emphasis added.)

 The availability of punitive damages for an EMTALA violation is, there-fore, a matter of state tort law. Kentucky law provides two different avenues for the recovery of punitive damages: one statutory and one under common law. KRS 411.184(2) provides for the recovery of punitive damages "only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice." However, in *Williams v. Wilson*, 972 S.W.2d 260 (Ky. 1998), we held that punitive damages may also be awarded under the common law standard of "gross negligence." Gross negligence means a "wanton or reckless disregard for the lives, safety, or property of others." *Gibson v. Fuel Transport, Inc.*, 410 S.W.3d 56, 59 (Ky.2013). Thus, punitive damages may be awarded, when the evidence satisfies either the statutory standard of KRS 411.184(2), or the common law standard of gross negligence.

Consistent with the foregoing authority, the trial court instructed the jury that it could award punitive damages upon a finding that the Hospital "acted towards James Milford Gray with oppression or gross negligence."[4] The jury responded in the affirmative.[5] We conclude that the evidence, viewed in accordance with *Lewis v. Bledsoe Surface Mining Company*, amply supports the verdict as to both "oppression," under KRS 411.184(2), and "gross negligence."

 KRS 411.184(1)(a) defines "oppression" as "conduct which is *specifically*

---

**4.** The "fraud" and "malice" prongs of KRS 411.184(1) were not included in the instructions.

**5.** On the verdict form beside the signatures of the eleven jurors who concurred in the verdict, the jury added the following hand-written notation, which the trial court incorporated into the final judgment:

We the jury find by clear and convincing evidence that St. Joseph Hospital demonstrated disregard for the lives and safety of its patients by not following their own policies or having processes in place that would ensure proper evaluations of their patients.

*intended* by the defendant to subject the plaintiff to cruel and unjust hardship." (Emphasis added.) The evidence does not show that the Hospital or any of its employees "specifically intended" to cause Gray's death or prolong his agony. Nevertheless, it is obvious from clear and convincing evidence that, despite Gray's gravely-ill condition, the Hospital and its emergency department personnel intended to remove Gray from the facility; that they left him unattended in a motel room without a wheelchair; and threatened him with arrest if he returned for additional medical assistance. "Cruel and unjust hardship" is the foreseeable aftermath of such treatment. "[A] person is presumed to intend the logical and probable consequences of his conduct ...." *Parker v. Commonwealth,* 952 S.W.2d 209, 212 (Ky. 1997). We therefore conclude that the finding of "oppression" was supported by the evidence. The jury instruction incorporating that basis for punitive damage liability was proper. The Hospital was not entitled to a directed verdict on that aspect of the case.

 We next consider whether the evidence supported the gross negligence standard by which punitive damages may be assessed for conduct in "wanton or reckless disregard for the lives, safety, or property of others." *Gibson,* 410 S.W.3d at 59 (citation omitted). "[Punitive damages] are given to the plaintiff over and above the full compensation for his injuries, for the purpose of punishing the defendant, of teaching him not to [commit the wrongdoing] again, and of deterring others from following his example". *Hensley v. Paul Miller Ford, Inc.,* 508 S.W.2d 759, 762 (Ky.1974) (quoting Prosser, *Law of Torts* § 2 (4th Ed.)).

 An employer may be liable for punitive damages based upon the conduct of its employees. *MV Transportation,*

*Inc. v. Allgeier,* 433 S.W.3d 324, 338 (Ky. 2014). The conduct need not relate to a single event viewed in isolation. "Even where a single act of negligence might not constitute gross negligence, gross negligence may result from the several acts." *Horton v. Union Light, Heat & Power Co.,* 690 S.W.2d 382, 388 (Ky.1985) (quoting *Brown v. Riner,* 500 P.2d 524, 528 (Wyo. 1972)). Further, "*Horton* expressly recognized that a finding of gross negligence and an award of punitive damages may be based, at least in part, upon evidence regarding the policies and procedures of the company." *Allgeier,* 433 S.W.3d at 338 (citing *Horton,* 690 S.W.2d at 388).

The Hospital denied that Gray was mistreated, citing an extensive list of the medical services provided to him during the two emergency room visits preceding his death. For example, the Hospital notes that on the first visit a triage nurse assessed Gray's condition and recorded his basic vital signs; a treatment nurse then conducted a "focal assessment," which included an assessment of his skin color, mental state and cognitive state. Physician's Assistant Adkins performed an additional examination and Dr. Parsley reviewed Gray's condition. Extensive laboratory studies were ordered even though Gray initially refused to cooperate with them, and x-rays were then taken of his abdomen. He was provided pain medicine, and given an enema and manual disimpaction of his stool to clear his bowels from the constipation.

When he returned several hours later, he was again examined by a triage nurse and evaluated by a treatment nurse who performed another focal assessment. Dr. Parsley examined him; additional lab studies were ordered and an upright chest x-ray was taken; a nasogastric tube was ordered and placed in Gray's stomach to determine if the bleeding was active; he

was given additional pain medicine and cleaned; Dr. Geren examined him, diagnosed his condition as acute gastritis with hemorrhage, and discharged Gray in what Geren thought was a stable condition; a hospital social worker tried to find somewhere to place Gray; and he was provided with a prescription voucher to obtain his medicine free of charge and a taxi voucher for free transportation.

 Based upon that measure of service, the trial court granted the Hospital a directed verdict on the medical screening prong of the Estate's EMTALA claim.[6] However, an alleged tortfeasor is not absolved of liability simply because it did some things right. Undoubtedly, the Hospital rendered helpful assistance to Gray during these final agonizing hours of his life. Upon application of the *Bledsoe Surface Mining Co.* standard for appellate review, focusing on the facts *in the light most favorable* to the punitive damages verdict, a more complete and disturbing picture emerges.

The jury heard evidence that a paraplegic, wheelchair-bound, gravely-ill pauper arrived at the Hospital's emergency room in severe distress and great pain. He was afflicted with severe constipation and a ruptured duodenal ulcer caused by duodenal peptic ulcer disease. The lining of abdominal cavity was inflamed with formation of pus. In that condition only hours away from death, he was twice ushered out the Hospital door. Gray's nephew, Larry Thomas, testified that the Hospital social worker told him, in effect, that the hospital was for sick people, not a hotel. Thomas and Gray's sister, Connie Mosley, both testified that the social worker said that Gray would be arrested if he returned. Another sister, Betty Hughes, testified

that she heard the Hospital's Director of Emergency Room Services, Marilyn Swinford, say that if Gray came back to the hospital, the police would be called to escort him off the premises and, possibly, to arrest him.

One of the expert witnesses at trial, Dr. Frank Baker, testified:

> I am absolutely stunned by what happened on the last visit. I mean, I think a sophomore medical student could have done the appropriate thing in this case, which is to have admitted the patient into the hospital, resuscitated the patient, started the patient's IV, and so on. This case is truly shocking from the standpoint of it is so obviously a patient who is very sick, who needs to be resuscitated, who needs to be admitted to an ICU, who needs a surgical consult, who needs to have a whole bunch of other things done, [but] who was sent home.
>
> [There were] flagrant violations of the standard of care, particularly egregious, outrageous, not understandable, not easily explainable; they are just so out of keeping with what nurses are taught about caring for patients, it is just a bit mindboggling to figure out why and how it happened.

Similarly, another expert witness, Dr. Eric Munoz, testified:

> I would say the hospital's conduct—I mean, the words horrific, egregious. I can't believe that in 1999 this would happen in the United States in America. But it did happen. That's why we're sitting here. The reason this law [EMTALA] was passed in 1988 was to try to help and prevent this from ever happening. But it happens. And it happened here. And this is just horrific. I mean,

---

**6.** As relevant here, EMTALA has two principal requirements: that a hospital competently screen a patient for medical problems, and that the patient be discharged only upon being medically stabilized.

this person died preventably and died a horrible death. And I'm just shocked.

Expert witness Janice Rodgers, R.N. testified as follows:

Essentially they quit on Mr. Gray.... It's been my experience that nurses ... who demonstrate this kind of behavior are just trying to get the patient out of their emergency room. That's been my experience. We used to call them GOM-ERs, Get Out of My Emergency Room.... And it just reflects the dismissive attitude of the nurses, and that they recklessly endanger[ed] this man by ignoring standards of care, deviating from standards of care—essentially ignoring them.... I don't understand why they would do it. And I'll tell you, in my experience, people presenting with this kind of presentation, clinical presentation, everything is done for them—even up to and including going up the chain of command, after you collaborate with the healthcare provider, to get the patient admitted. He needs a line. If you can't do it in the emergency room, you need to call the surgeon. He needs a line. He's essentially circling the drain, and that was disregarded. Mr. Gray had nobody to stand up for him. This is totally disgusting. It turns my stomach. And its reckless disregard, grossly disregarding all of the standard of care that say that otherwise should have been done.

Other testimony established that upon Gray's first dismissal from the emergency room, he had an ashen-gray appearance and was in severe pain. His niece testified that she was reluctant to take him into her home because he appeared to be gravely ill. When he was left with nowhere else to go, she relented and he died in her home shortly thereafter. Ample evidence supported the Estate's EMTALA claim that the Hospital failed in the second aspect of

its duty under EMTALA: to stabilize its patient before dismissing him from the emergency room.

The evidence clearly supported a jury finding of wanton or reckless disregard for Gray's life and safety, and thus was sufficient to overcome the Hospital's motion for a directed verdict. The evidence favoring the Hospital was not so overwhelmingly convincing as to negate the countervailing proof and compel a reasonable jury to find in the Hospital's favor. From the totality of evidence, the jury could have reasonably believed, as it apparently did, that the Hospital engaged in illegal "patient dumping" in its actions toward Gray. Given the strong public policy against the conduct that EMTALA forbids, we conclude that the evidence adequately supported findings of oppression and gross negligence so as to authorize a verdict for punitive damages.

### III. SUFFICIENT EVIDENCE WAS PRESENTED TO PROVE THAT THE HOSPITAL RATIFIED THE CONDUCT OF ITS EMERGENCY ROOM STAFF

The Hospital next contends that a directed verdict dismissing the claim for punitive damages should have been granted because the evidence failed to establish that the Hospital had ratified the conduct of the emergency room personnel underlying the punitive damages award. KRS 411.184(3) expressly prohibits the assessment of punitive damages against an employer for the conduct of an employee or agent, unless the offensive conduct was 1) authorized by the employer; 2) anticipated by the employer; or 3) ratified by the employer. *University Medical Center, Inc. v. Beglin*, 375 S.W.3d 783, 793–794 (Ky.2011). The trial court's instruction to

the jury properly incorporated the essential language of KRS 411.184(3).[7]

■ The Court of Appeals concluded that the evidence presented at trial adequately supported a finding that the Hospital ratified the offensive behavior of its emergency room personnel. Accordingly, the parties have narrowed the issue to that aspect of an employer's punitive damages liability. As explained in *Beglin*, "ratification is, in effect, the after the fact approval of conduct, much as authorization is the before the fact approval of the conduct." *Id.* at 794.

■ We begin our discussion of this issue by agreeing with the Hospital's contention that an employer cannot be regarded as having ratified the wrongful conduct of its employees and agents simply by denying that wrongful conduct occurred or by mounting a legal defense against actual or anticipated lawsuits arising from the conduct. *See Beglin*, 375 S.W.3d at 796 (Scott, J., dissenting) (citing *Manning v. Twin Falls Clinic & Hospital, Inc.*, 122 Idaho 47, 830 P.2d 1185, 1194 (1992)) ("[T]he defense of a matter by an employer does not constitute ratification.").

However, we reject the Hospital's argument that an employer's ratification under KRS 411.184(3) can only be established by the employer's explicit affirmation or endorsement of the wrongful behavior. The Hospital cites language in *Wolford v. Scott Nickels Bus Co.* in which our predecessor court makes reference to "the rule that in ratification by the principal of a tort of the agent it is essential that the ratification be explicit." 257 S.W.2d 594, 596 (Ky.1953) (citing 2 C.J.S. *Agency* § 37(d), page 1076). But *Wolford also* states: "In order that the ratification may be effective, there must be an intention to ratify, although the intention may be inferred from the facts and circumstances. As a consequence, ratification cannot be inferred from acts which may be readily explained without involving any intent to ratify." *Id.* (citing Am.Jur. *Agency* § 221, page 176).

■ Despite *Wolford*'s ambiguity, the principle is well settled that ratification may be implied by the conduct of the employer.

> Ratification of the unauthorized acts of one assuming to act as agent may be either express or implied: express, as by spoken or written words; implied, when the conduct of the principal constitutes an assent to the acts in question. And the acts of the principal, it seems, will be liberally construed in favor of a ratification.

*Detroit Fidelity & Surety Co. v. Gilliam*, 237 Ky. 425, 34 S.W.2d 971, 974 (1931); *Gillihan v. Morguelan*, 299 Ky. 671, 186 S.W.2d 807, 809 (1945) ("The ratification of an unauthorized act of an agent may be express or it may be implied from the acts and conduct of the principal."). Like any other factual issue, ratification of wrongful conduct may be proven upon the application of reasonable inferences drawn from circumstantial evidence sufficient to convince a reasonable juror that the employer

7. The instruction stated:

> In determining whether to award punitive damages against [the Hospital], you shall only assess punitive damages if you believe from the evidence that [the Hospital] authorized or ratified or should have anticipated the acts undertaken by its agents or employees. The verb "to ratify" means: "to approve and sanction formally: confirm (ratify a treaty)."

Accordingly, ratification is, in effect, the after-the-fact approval of conduct much as authorization is the before-the-fact approval of the conduct. A defendant is entitled to defend claims against it. Evidence of [the Hospital's] approval during litigation of the acts of its employees or agents does not constitute the ratification required for an award of punitive damages.

approved of the conduct after the fact, even if it had not authorized or anticipated the offensive behavior in advance.

■ An employer's ratification of an employee's offensive conduct requires two elements: 1) an after-the-fact awareness of the conduct; and 2) an intent to ratify it. *Papa John's International, Inc. v. McCoy*, 244 S.W.3d 44, 52–53 (Ky.2008) ("In order to have ratified [the employee's] alleged malicious prosecution of McCoy, [the employer] had to have both (1) knowledge that Burke's statement was false and (2) the intention to ratify it.").

With the above principles in mind, and viewing the evidence in the light most favorable to the verdict, we are satisfied that a reasonable jury could infer that the Hospital ratified the conduct of the emergency room staff relating to Gray so as to satisfy the requirements of KRS 411.184(3). The relevant conduct spanned a period of some sixteen hours during which a complicated series of events occurred: Gary was treated and discharged despite manifest pain and an ill appearance; an ambulance service was hired to remove him from the premises; after rebuffing his first attempt to be readmitted, hospital employees wheeled Gray off the premises to a motel and paid for his room; after motel employees observed his dire condition and called for 911 emergency service, he was returned to the Hospital and then ushered off the premises in a taxi.

The conduct of Hospital employees went well beyond the kind of idle neglect that might reasonably go unnoticed by supervising administrators. The proactive nature of the concerted effort to keep Gray away from the Hospital supports a reasonable inference the Hospital's management personnel were aware of what was happening, and although they did not anticipate or authorize Gray's expulsion, they ratified it.

The verdict in this case, however, does not depend upon inference alone; there was direct evidence of explicit after-the-fact approval, or ratification. Gray's sister, Betty Hughes, testified that Marilyn Swinford, the Hospital's Director of Emergency Room Services, told her after Gray's final discharge that if he returned, the Hospital would call the police to escort him off the premises and, possibly, to arrest him.[8] Swinford's explicit warning established an unequivocal ratification at the management level of the measures taken over the preceding sixteen-hour period to expel Gray. Thus, this extraordinary series of events culminated with a clear manifestation of the Hospital's awareness of the staff's effort to be rid of Gray and an explicit threat which can be reasonably construed as an intentional endorsement of those efforts.

In summary, a principal's intention to ratify "may be inferred from the facts and circumstances" surrounding the events. We are satisfied from the totality of circumstances that sufficient evidence was presented to prove that the Hospital had knowledge of its employee's handling of Gray and that it intended to ratify their conduct, as required by *Papa John's International, Inc. v. McCoy*. The trial court and the Court of Appeals correctly determined that the Hospital was not entitled to a directed verdict based upon the claim that the evidence failed to satisfy the requirements of KRS 411.184(3).

**8.** In the typical situation, as here, where the "employer" is a corporation, or other statutorily created legal entity, the "ratification" must necessarily be evinced by an employee of the entity of sufficient authority to bind the inanimate entity. Here, it is clear that the *Director* of Emergency Room Services possessed the sufficient authority to act as the ratifying personnel on behalf of the Hospital.

## IV. THE JURY WAS PROPERLY IN-STRUCTED REGARDING THE HOSPITAL'S EMTALA LIABILI-TY FOR CONDUCT OF EMER-GENCY ROOM PHYSICIANS

The Hospital contends that the trial court erred by instructing the jury that "[f]or purposes EMTALA, doctors, as well as nurses and employees of [the Hospital], are agents of [the Hospital]." That instruction allowed the jury to hold the Hospital accountable for the EMTALA violations resulting from the conduct of the Hospital's emergency room physicians, Drs. Parsley and Geren, who were not classified as employees of the Hospital, but were instead independent contractors employed to staff the Hospital's emergency room. We have not heretofore determined whether the conduct of a hospital's independent contractor physicians may form the basis of punitive damage liability under EMTALA.

The Hospital primarily relies upon the general rule of agency law that, ordinarily, employers are not vicariously liable for the conduct of non-agents over whom they have no control. *Taylor v. Jewish Hospital & St. Mary's Healthcare, Inc.* provides: "Under the common law doctrine of *respondeat superior*, "a principal is vicariously liable for damages caused by torts of ... an agent or subagent, *other than an independent contractor*, acting on behalf of and pursuant to the authority of the principal." 26 F.Supp.3d 642, 648 (W.D.Ky. 2014) (citations omitted) (emphasis added.)

The application of this general rule, however, is tempered by a well-established countervailing rule that one charged with a statutory duty "cannot escape from the responsibility attaching on him of seeing that duty performed by delegating it to the contractor, and cannot relieve himself from liability to any person injured by a failure to perform it." *Brown Hotel Co. v. Sizemore,* 303 Ky. 431, 197 S.W.2d 911, 913 (1946). *Steams Coal Co. v. McPherson* applied that principle to hold that a mine owner, required by statute to ventilate the mine, could not "escape liability by alleging and showing that the mine, or that part of it in which appellee was injured, was being operated by an independent contractor [.]" 144 Ky. 730, 139 S.W. 971, 973 (1911). In short, one cannot avoid liability for the breach of a statutory duty by claiming to have delegated the performance of that duty to an independent contractor.

EMTALA imposes two specific statutory duties upon hospitals, like St. Joseph, that participate in Medicare and have an emergency department: "(1) the hospital must conduct appropriate medical screening to persons visiting the hospital's emergency room; and (2) the hospital may not, subject to certain exceptions, transfer out of the hospital a patient whose medical condition has not been stabilized." *Brewer v. Miami County Hospital,* 862 F.Supp. 305, 307 (D.Kan.1994) (citing 42 U.S.C.A. § 1395dd(a) and *Abercrombie v. Osteopathic Hospital Founders Association,* 950 F.2d 676, 680 (10th Cir.1991)).

In *Roberts v. Galen of Virginia, Inc.,* 112 F.Supp.2d 638 (W.D.Ky.2000)[9], a patient being treated at Humana Hospital in Louisville by a nonemployee surgical resident was transferred out to a hospital in Indiana where her condition deteriorated significantly. The patient filed an action

---

9. *Roberts* was decided following remand by the United States Supreme Court in *Roberts, guardian for Wanda Y. Johnson v. Galen of Virginia, Inc., formerly d/b/a Humana Hospital–University of Louisville,* 525 U.S. 249, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999) (holding that 42 U.S.C.A. § 1395dd(a) contains no express or implied "improper motive" requirement).

against Humana alleging EMTALA violations. Humana argued, as St. Joseph does here, that it could not be held liable under EMTALA for the actions of its independent contractor physician, the surgical resident primarily responsible for the patient's transfer out of the hospital. After noting the language of 42 U.S.C.A. § 1395dd(a) that expressly places the EMTALA duties on "hospitals," the federal district court said:

> The definition of "transfer" [in the statute] makes it clear that Congress intended to hold hospitals directly accountable for the actions of physicians and other medical personnel. The definition imposes liability upon the hospital for the actions of persons "affiliated or associated, directly or indirectly" with the hospital. The surgical resident that made the decision to transfer [the patient] in this case falls within that definition, and Humana could be held directly accountable under EMTALA for his actions.

*Roberts,* 112 F.Supp.2d at 640–641. In support of its conclusion that hospitals are directly, rather than vicariously, liable for the actions of physicians, the district court also cited a regulation issued by the Secretary of Health and Human Service supporting this concept:

> The [EMTALA] statute imposes duties on a hospital, many of which can only be effectively carried out by *physicians in some way affiliated with the hospital.* Neither the statute nor the regulations attempt to define the means by which the hospital meets its statutory obligations to provide emergency screening examination, treatment or transfer.

*Id.* at 641 (citing 59 Fed.Reg. 32,086, 32,-115 (1994)) (emphasis added).

The reasoning of *Roberts* is persuasive and it is consistent with the general principle of *Brown Hotel Co.* and *Steams Coal Co.* that one who delegates the performance of a statutory duty to an independent contractor is not relieved of liability for injuries arising from the contractor's failure to comply with the duty. A hospital remains liable for compliance with EMTALA, and does not escape responsibility by affiliating independent contractor physicians and other nonemployees to provide EMTALA compliance. "[EMTALA] is a strict liability statute: it asserts what a hospital *must* do, and creates liability for any failure. If a hospital does not follow the requirements of the statute, it is liable. Any personal harm to an individual will result in damages for personal injury under local state law if caused by the violation..." *Martin v. Ohio County Hospital Corporation,* 295 S.W.3d 104, 113 (Ky. 2009).

Accordingly, we conclude that the jury was properly instructed with respect to the Hospital's responsibility under EMTALA for actions of Drs. Parsley and Geren. The Hospital is not entitled to a new trial as a result of the instruction.

## V. THE PUNITIVE DAMAGES AWARD DID NOT VIOLATE FEDERAL DUE PROCESS STANDARDS AND THE HOSPITAL IS NOT ENTITLED TO A REMITTITUR OF THE PUNITIVE DAMAGES AWARD

The Hospital contends that a comparison of the punitive damages awarded in this case, $1,450,000.00, and the compensatory damages assignable to the hospital, $3,750.00, yields a ratio of punitive damages to compensatory damages that violates the Fourteenth Amendment Due Process Clause, and is therefore contrary to United States Supreme Court decisions imposing due process limitations on puni-

tive damages awards.[10] *See BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). As such, this argument presents a constitutional challenge to the punitive damages award in this case. In its constitutional analysis of punitive damage awards, the Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." *Gore,* 517 U.S. at 582–583, 116 S.Ct. 1589.

Constitutional challenges alleging excessiveness of punitive damage awards are reviewed *de novo. Ragland v. DiGiuro,* 352 S.W.3d 908, 917 (Ky.App.2010) (citing *Steel Technologies, Inc. v. Congleton,* 234 S.W.3d 920, 931 (Ky.2007)[11] and *Cooper Industries,* 532 U.S. at 437, 121 S.Ct. 1678) ("Unlike the measure of actual damages suffered, which presents a question of historical or predictive fact, ... the level of punitive damages is not really a 'fact' 'tried' by the jury"). *BMW of North America, Inc. v. Gore* provides a firmly-established blueprint for undertaking that *de novo* review.

As noted in *Ragland,* 352 S.W.3d at 917, the Supreme Court in *Gore* instructed reviewing courts to consider three "guideposts" in reviewing the constitutionality of a punitive damage award:

1) the degree of reprehensibility of the defendant's conduct;

2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and

3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

Additional consideration is required "where 'a particularly egregious act has resulted in only a small amount of economic damages.'" *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (quoting *Gore,* 517 U.S. at 582, 116 S.Ct. 1589). Ultimately, each case must stand upon its own facts with the decisive measure being the reasonableness of the award under the circumstances. "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness ... properly enter[s] into the constitutional calculus." *Id.* (quoting *TXO Production Corporation v. Alliance Resources Corporation,* 509 U.S. 443, 458, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)).

Our analysis proceeds with an application of *Gore*'s three guidelines.

## 1. Degree of Reprehensibility

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Ragland,* 352 S.W.3d at 917 (quoting *Gore,* 517 U.S. at 575, 116 S.Ct. 1589). This is so because "a jury has a 'somewhat superior vantage' over reviewing courts 'with respect to the first *Gore* inquiry ... primarily with respect to issues turning on witness credibility and demeanor.'" *Id.* (quoting *Cooper*

---

10. The punitive damage/compensatory damage ratio is $1,450,000/$25,000, or 58:1. Comparing the punitive damages to only the Hospital's 15% share of the compensatory

damage award, $1,450,000/$3,750, produces a ratio of 386:1.

11. Abrogated on other grounds by *Osborne v. Keeney,* 399 S.W.3d 1 (Ky.2012).

*Industries,* 532 U.S. at 440, 121 S.Ct. 1678). "After all, a punitive damage award is an expression of ... moral condemnation by the voice of the community." *Id.* (citations and internal quotation marks omitted).

In *State Farm Mutual Automobile Insurance Co. v. Campbell,* the Supreme Court identified "reprehensibility" as the most important guidepost, and it cited five factors for assessing the reprehensibility of the conduct under review. Those factors are:

1) whether the harm caused was physical as opposed to economic;

2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;

3) whether the target of the conduct had financial vulnerability;

4) whether the conduct involved repeated actions or was an isolated incident;

5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell,* 538 U.S. at 419, 123 S.Ct. 1513 (citing *Gore,* 517 U.S. at 575–577, 116 S.Ct. 1589); *Ragland,* 352 S.W.3d at 917 (citations omitted).

*Campbell* further explains "the existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." 538 U.S. at 419, 123 S.Ct. 1513.

The application of *Campbell's* five reprehensibility factors weighs heavily against the Hospital. The resulting harm was not economic; it was physical in the most egregious sense, with Gray being *twice* ushered away from the Hospital in great physical pain and mental anguish, and dying at his niece's home under desperate circumstances. In rather dramatic fashion

and in violation of federal law, the offensive conduct exhibited a gross indifference to, and a reckless disregard for, Gray's health and safety. Gray was a paraplegic pauper; unquestionably among the most financially vulnerable members of the community. The harm that befell Gray was not accidental; he was intentionally and somewhat forcefully evicted from the Hospital while he suffered in severe pain from an illness that turned fatal. The threat to have him arrested manifested a measure of ill-will commensurate with malice.

The only reprehensibility factor favoring the Hospital is that the incident appears to be an unusual incident rather than a recurring or often repeated practice. Overall, these five factors weigh heavily in support of the jury's punitive damages verdict.

## 2. The Punitive/Compensatory Damage Ratio

The punitive damages in the amount of $1,450,000.00 and compensatory damages assessed against the Hospital in the amount of $3,750.00 equates to a ratio of 386 to 1. The Hospital contends that this ratio is, as a matter of law, outside of the constitutional parameters established by the Supreme Court in *Gore, Campbell,* and *Cooper Industries.*

As noted above, the Supreme Court has not identified "concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *Campbell,* 538 U.S. at 424, 123 S.Ct. 1513. Instead, it has "consistently rejected" the constitutional evaluation of punitive damages "by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." *Gore,* 517 U.S. at 582, 116 S.Ct. 1589.

*Campbell* emphasized that there is no "bright-line ratio which a punitive dam-

ages award cannot exceed." 538 U.S. at 425, 123 S.Ct. 1513. However, *Campbell* also recognized that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* Thus, while the Supreme Court has made it clear that the question is not governed by a mathematical formula, it is equally clear that punitive/compensatory damage ratios of 10:1 and greater are burdened with at least the appearance of unconstitutionality and cannot survive appellate scrutiny in the absence of special circumstances.

*Campbell* and *Gore* identify one such circumstance in which the constitutionality of a punitive damage award will not be affected by a damage ratio exceeding single-digits. The United States Supreme Court said in *Campbell* that "ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" 538 U.S. at 425, 123 S.Ct. 1513 (quoting *Gore,* 517 U.S. at 582, 116 S.Ct. 1589). "The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* The Supreme Court acknowledged that, "[i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." *Gore,* 517 U.S. at 568, 116 S.Ct. 1589. The Supreme Court recognized that the states (through the courts and, perhaps, the state legislatures where they are not constitutionally restrained) have latitude to exceed the single-digit rule in exceptional circumstances, including where the economic damage is relatively low and the conduct is particularly egregious. In such cases, a much higher ratio is "reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence." *Id.*

This case presents the very circumstances contemplated in *Campbell* and *Gore* as an exception to the single-digit ratio limitation: two extraordinary and compelling circumstances intersect in a way that dissolves the constitutional doubt about a very large punitive/compensatory damage ratio. First, the conduct that exacerbated Gray's pain and led to his death was particularly offensive and contrary to the public policy statutorily embodied in EMTALA, thus justifying in the minds of reasonable jurors a greater award of punitive damages. It is axiomatic that the amount of punitive damages varies directly with the egregiousness of the offensive conduct. Second, Gray was an impoverished paraplegic with little in the way of economic prospects and quality of life. The compensatory damages that would ordinarily arise from his injury would correspondingly be exceedingly small.

The confluence of these unique circumstances inherently sets the stage for high punitive/compensatory damage ratio, well beyond the single-digit range. Accordingly, this is a proper case to apply the *Gore–Campbell* exception.

In *TXO Production Corporation v. Alliance Resources Corporation,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), the Supreme Court upheld a punitive/compensatory damage ratio of 526:1, based upon a punitive damage award of $10 million compared to compensatory damages of $19,000.00 in a case involving a slander of title claim. The Ohio Supreme Court in *Wightman v. Consolidated Rail Corporation,* 86 Ohio St.3d 431, 715 N.E.2d 546 (1999), upheld a punitive damage/compensatory ratio of 6,250:1 in a case involving a train-car collision at an unsafe railroad crossing. The railroad argued that the

punitive damage award of $15 million against a mere $2,400.00 in compensatory property damage was unconstitutional. The Court disagreed, citing *TXO Production Corporation* and the three guideposts of *Gore*, concluding that the award was justified by the existence of a substantial harm, a continuing risk, a deterrent effect, and an economically viable and liable company.

Upon application of the Supreme Court's analysis in *Gore, Campbell, Cooper Industries* and other cases cited above, we conclude that the punitive damage award is not unconstitutionally disproportional to the loss of life which resulted from the Hospital's EMTALA violation.[12]

### 3. The Possible Civil or Criminal Penalties

The third and final guidepost of the *Gore* analysis requires an examination of "the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct[.]" *Gore*, 517 U.S. at 583, 116 S.Ct. 1589. "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.* (citation and internal quotation marks omitted). EMTALA provides for a monetary civil penalty for a violation of its provisions.

42 U.S.C.A. § 1395dd(d)(*l*)(A) provides that "A participating hospital that negligently violates a requirement of this section is subject to a civil money penalty of not more than $50,000 (or not more than $25,000 in the case of a hospital with less than 100 beds) for each such violation." Here, with two potentially unlawful discharges and two potential EMTALA violations, the maximum civil penalty that could have been awarded here was $100,000.00. Unlike *Ragland*, where the wrongful conduct was murder, there is no comparable criminal sanction to be imposed for an EMTALA violation and we decline to suggest that any criminal sanctions were applicable to the offensive conduct at issue here. Our weighing of this factor is inconclusive and thus affords no basis for deference to a legislative sanction.

### 4. Conclusion

In summary, upon application of the applicable Supreme Court decisions defining the constitutional due process boundaries of a punitive damages award, we are satisfied that under the circumstances of this case, the punitive damages award returned by the jury comports with due process. The provisions of EMTALA requiring hospital emergency rooms to admit and treat all patients who present themselves at their doors is a crucial element of our social safety net, specifically designed to assure that the poor, the indigent, the paupers, the homeless, the uninsured, and the most unfortunate and vulnerable members of the community receive appropriate and essential skilled health care services without qualification. That is the public policy embedded within EMTALA, and it falls to this Court, in its consideration of civil actions brought under EMTALA to support that public policy.

The purpose behind any award of punitive damages is "to further a State's le-

---

**12.** *See McKowan v. Bentley*, 773 So.2d 990, 998 (Ala.1999) (Jury award of $2 million in punitive damages was not excessive in wrongful death action arising out of patient's death from post-operative infection, where the patient was released to go home after only two days in hospital and was subjected to at least seven additional invasive procedures performed before her death; award was not disproportional to loss of life, and award was not unusually large compared to awards in other wrongful death cases).

gitimate interests in punishing unlawful conduct and deterring its repetition." *McDonald's Corporation v. Ogborn,* 309 S.W.3d 274, 298 (Ky.App.2009) (citing *Gore,* 517 U.S. at 568, 116 S.Ct. 1589). Historically, " 'punitive' or 'exemplary' damages ... are given to the plaintiff over and above the full compensation for his injuries, for the purpose of punishing the defendant, of teaching him not to do it again, and of deterring others from following his example." ' *Hensley v. Paul Miller Ford, Inc.,* 508 S.W.2d 759, 762 (Ky.1974) (quoting Prosser, *Law of Torts* § 2, 9 (4th ed.)).

To regard the single digit punitive/compensatory damage ratio mentioned in *Campbell* as a constitutionally-mandated cap on punitive damages would destroy the important public policy for which punitive damages exist. Applied here, the maximum punitive damage award authorized by a single digit ratio would be equal to $37,125.00.[13] Small punitive damages awards would arise most often in cases of impoverished plaintiffs, like Gray and would have minimal punitive effect or deterrent value. Far from supporting the public policy behind punitive damages and EMTALA, the single digit limitation could actually undermine that public purpose by providing no deterrent to the mistreatment of indigents, preserving the protective purpose of the law only for wealthy plaintiffs whose compensatory economic losses would be substantially greater.

Punishment for the violation that occurred and deterrence of future violations is an integral component of our determination that a $1,450,000.00 punitive damage award is reasonable under the circumstances of this case, and lies comfortably

within permissible limits of constitutional due process. As such, we affirm the punitive damages award returned by the jury.

## V. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY NOT DISMISSING AN ALLEGED "SLEEPING JUROR"

The Hospital argues that a new trial should be granted because Juror 4642 was observed sleeping during portions of the trial, and the trial court denied the Hospital's motion to designate Juror 4642 as an alternate juror to be removed from the panel before deliberations began. Concern about the juror's inattentiveness was first raised by the trial court at a bench conference shortly after the Hospital had begun its case-in-chief on what appears to be the sixth day of trial testimony.[14] The trial court described Juror 4642's sleeping as "constant."

At that point, the Hospital requested no relief and Juror 4642 remained on the panel. Without specifically referring to Juror 4642, the trial court reminded jurors to request a break anytime they had trouble staying awake. On a later occasion, the trial court stopped the testimony and raised the issue again, this time describing Juror 4642 as "passed out." Again, however, the Hospital did not request relief. Concern about the juror's inattentiveness was mentioned on several occasions throughout the remainder of the trial, but no specific action to address the concern was requested of, or taken by, the trial court.

When the presentation of evidence was completed, the Hospital moved the court to designate Juror 4642 as an alternate juror, to be removed prior to deliberations. The

---

13. 9.99 × $3,750.00 equals $37,125.00.

14. It appears that after three days of jury selection and opening statements, the presentation of the evidence took nine days. Closing arguments and jury deliberations consumed two days.

Estate objected to the motion. The trial court denied the motion. Instead, the alternate juror was randomly selected, and Juror 4642 remained on the panel.

A juror's inattentiveness, which certainly includes falling asleep during the trial, "is a form of juror misconduct, which may prejudice the defendant and require the granting of a new trial." *Lester v. Commonwealth*, 132 S.W.3d 857, 862 (Ky.2004) (citing 58 Am.Jur.2d *New Trial* § 229). *See Young v. Commonwealth*, 50 S.W.3d 148, 164 (Ky.2001); *Shrout v. Commonwealth*, 226 Ky. 660, 11 S.W.2d 726 (1928). As one means of redressing the problem of a sleeping juror, "a trial court may remove a juror for cause at the conclusion of the evidence as an alternate juror[.]" *Lester*, 132 S.W.3d at 863 (citing *Hubbard v. Commonwealth*, 932 S.W.2d 381, 382 (Ky.App. 1996). "A trial court's decision whether to remove a juror from a panel that has already been seated is reviewed for abuse of discretion." *Id.* The test for abuse of discretion is whether the trial judge's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky.2000).

Certainly, removing the sleepy juror was an option well within the trial court's discretion. The issue we confront is whether the trial court in the exercise of sound discretion was compelled to remove Juror 4642. Our ability to review the incident is limited by a trial record that preserves only what was said about the juror's behavior; we cannot see the conduct that was apparent to the trial court. Concern for the juror's inattentiveness is well-founded, but the degree of inattentiveness was not well documented. The record presents only general references to the juror's occasional slumber but does not detail the extent to which Juror 4642 actually missed hearing the testimony. No request was made to examine the juror in chambers about his apparent inattentiveness; he was not even directly confronted about the matter.

Juror 4642's attentiveness to the trial testimony and his corresponding ability to effectively engage in the jury room deliberations is not established in the record. The Hospital's position that the juror was unqualified to deliberate is therefore supported only by its speculation. "Prejudice will not be presumed from a silent record." *Hart v. Commonwealth*, 116 S.W.3d 481, 483 (Ky.2003) (quoting *Bazé v. Commonwealth*, 965 S.W.2d 817, 824 (Ky.1997) (citing *Walker v. Commonwealth*, 476 S.W.2d 630, 631 (Ky.1972)).

We extend great deference to the ability of trial judges to maintain proper courtroom decorum because "[t]he trial judge is in the best position to determine the nature of alleged juror misconduct and the appropriate remedies for any demonstrated misconduct." *Graham v. Commonwealth*, 319 S.W.3d 331, 337 (Ky.2010) (quoting *Ratliff v. Commonwealth*, 194 S.W.3d 258 (Ky.2006)). Absent a more compelling demonstration that the trial court abused its discretion, we are constrained to deny the Hospital's requested relief.[15]

## VI. CONCLUSION

For the foregoing reasons the judgment of the Fayette Circuit Court is affirmed.

---

15. It is worth noting that, while only nine jurors were required to make a verdict, the verdict in this case was signed by eleven of the twelve jurors. Without depreciating the Hospital's right to have a jury of twelve qualified and competent individuals, we observe that, although Juror 4642 was among the jurors agreeing to the verdict, it cannot be said the verdict depended upon his vote.

All sitting.Minton, C.J.; Hughes, Keller, Noble, Venters, and Wright, JJ., concur.

Cunningham, J., concurs by separate opinion.

CUNNINGHAM, J., CONCURRING:

I concur completely with the excellent opinion by Justice Venters. I write only to lament that we remain constrained by the U.S. Supreme Court as to the illogical consideration of compensatory damages in determining the appropriateness of the amount of punitive damages.

Every law student knows that punitive damages are to punish egregious wrongdoing by the tortfeasor. It is not intended to be a windfall for the victim, although in reality it can be a lucrative award. The well educated, skilled, and young victim of a tortious act will normally have the potential for a higher compensatory award in the like of lost future income than the poor, unskilled, uneducated and the elderly. Or, as in this case, the handicapped homeless.

Such a factor can be equally unfair when applied to injuries to property. A wrongful "trashing out" of a hovel by an errant lending institution is deserving of no less punitive damages than the victimizing of the most opulent mansion.

It is a paradox that in attempting to keep the amount of punitive damages within constitutional range, we invade an even more critical constitutional interest—equal protection.

Justice Venters has aptly pointed out that the *Campbell* case allows some flexibility on that factor, which is helpful in this case. However, it remains a stump in the road with which we constantly have to collide or drive around. Were it my call, I would pitch that required consideration once and for all.