RENDERED:  MARCH 10, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0930-ME

KENNETH SCOTT HIGGINS                        APPELLANT


v.            APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE LIBBY G. MESSER, JUDGE
ACTION NO. 22-D-00469-001


ELLIE SCORSONE-STOVALL                   APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, ECKERLE, AND KAREM, JUDGES.

CALDWELL, JUDGE:  Kenneth Higgins appeals from the Fayette Family Court's
entry of an interpersonal protective order (IPO).  We affirm.

## FACTS

Appellee, Ellie Scorsone-Stovall (Ellie), filed a petition for an order of
protection against her next-door neighbor, Appellant, Kenneth Higgins (Kenneth)
in April 2022.  Ellie alleged Kenneth had been on her front porch three times on

April 18 – each time looking into the security camera, leaving flowers, and recording oral messages addressing her by name. One message stated he would always love her unconditionally. Another message stated: "I accept rejection . . . salutations." The last message was inaudible according to the petition, but Ellie later testified he muttered something about protection in the last message.

The petition also alleged Kenneth sent her Facebook messages in early March 2022. The first message was: "Aren't you one of these females?" The second message was: "First you smile, then you frown, then you shrug at me . . . what do you mean?"

The petition further alleged Kenneth tried to break into her home at midnight the previous December. Ellie claimed that his behavior amounted to stalking, and she alluded to him having a "long history of mental health issues with us and other neighbors on our street." She stated she was scared she "might be hurt, raped or even killed."

The family court entered a temporary IPO which, *inter alia*, forbade Kenneth from going within 500 feet of Ellie's home. Kenneth attended a hearing with his counsel a few weeks later. At this hearing, counsel mentioned Kenneth had schizophrenia and had previously been living with his parents but was unable to return home due to the 500-foot restriction.

At the scheduled final hearing, the family court noted Kenneth was not present. His counsel stated Kenneth was in a psychiatric hospital. The family court inquired into whether Kenneth had been involuntarily committed or had voluntarily entered treatment and when he might be released. Upon his counsel's suggestion, Kenneth's parents entered the courtroom to answer the court's questions about these matters.

Kenneth's parents stated he was not committed but had voluntarily entered the hospital a few days beforehand. They believed he would probably be released in a few days but did not know exactly when. His mother also volunteered that they did not know where he was for a few days and had to file a missing person report before finding out Kenneth was in the hospital.

The family court judge stated she did not think the hearing could go forward in Kenneth's absence, since he was hospitalized and unable to be there. She also noted concerns about his mental health were mentioned in the petition.

Ellie's counsel objected to delaying the proceedings. The family court judge expressed concerns that any order entered in Kenneth's absence would be invalid and might violate due process. She indicated she viewed Kenneth's absence as not being of his own volition or choice.

Kenneth's counsel interjected that his "clients" also wanted to go forward with the hearing. He acknowledged that his ability to communicate with

Kenneth was limited. And he stated that even when he was able to talk to Kenneth, "it doesn't register."

Kenneth's counsel said he did not plan to have Kenneth testify, after previously stating he did not believe the testimony would be insightful due to "significant mental defects." The family court asked whether Kenneth's counsel would be able to effectively advocate for all of Kenneth's legal interests and be comfortable acting as his guardian *ad litem*. Counsel indicated he could do so.

The court decided to go forward with the hearing. It noted Kenneth's counsel was present, counsel did not plan on having Kenneth testify, counsel had communicated with his client to the extent possible, and counsel said he was able to advocate for all of Kenneth's legal interests and rights. The family court then heard testimony from Ellie, her parents, and Kenneth's parents followed by closing argument by counsel. Ellie's testimony offered context about the allegations in her petition.

Kenneth's parents testified, *inter alia*, about his mental health history. And they testified the 500-foot restriction resulted in their son being barred from their home, so he had to move to an apartment – where they were unable to keep track of him. They testified they believed they could better offer assistance and supervision over Kenneth at their home.

Ellie and her counsel questioned whether Kenneth's parents could prevent him from going on Ellie's family's property or contacting her if he returned home. They pointed to Kenneth's parents' testimony that they were not aware at the time of his apparent attempt to enter Ellie's house at midnight in December and his returning to her home three times in one day in April to leave flowers and messages.

The family court asked Kenneth's parents whether a mental health petition had ever been filed concerning Kenneth. They testified that one had been previously filed, resulting in his being hospitalized for a time. But they also testified there was no current mental health petition pending.

Kenneth's counsel argued against the issuance of an IPO. But if the family court decided to issue an IPO, counsel argued that Kenneth should be allowed to move home with appropriate restrictions to offer protection to Ellie.

At the close of the hearing, the family court orally stated it would enter an IPO restraining Kenneth from going within 500 feet of Ellie's home address for one year and entered a written order with findings. Kenneth filed a timely appeal. Further facts will be discussed as necessary to resolve the issues raised upon appeal.

# ANALYSIS

Kenneth, via new counsel, asserts palpable, structural error in the family court's conducting the hearing while he was not present and without a formal determination of his competency. He claims the family court's actions resulted in violations of the 14th Amendment of the United States Constitution and Sections 1, 2, 11, and 14 of the Kentucky Constitution. He also argues the IPO must be reversed as based on conduct not constituting stalking.

## I. No Palpable Error in Conducting Hearing While Appellant Not Present and Without a Formal Establishment of His Competence Under Facts Here

Kenneth argues that the family court erred in holding the IPO hearing when he was not present due to hospitalization for mental health care and in the court's "failing to establish" his competence. He concedes that these alleged errors were not "explicitly preserved" and requests that this Court review for palpable error if "there is any error in preservation." We construe this as a request to review unpreserved issues for palpable error.

Although Kenneth's appellate counsel notes an apparent lack of case law directly on point, he argues that a family court should be required to cancel or postpone an IPO hearing when a respondent is receiving mental health care. He further contends that Kenneth's competence should have been formally established before an IPO was issued against him.

We conclude the issues are unpreserved since there was no request for a continuance and no objection to the family court conducting the hearing at the scheduled date and time. In fact, counsel for both parties requested the hearing proceed despite the family court's reluctance to do so in Kenneth's absence. And Kenneth's counsel did not assert at that time that Kenneth was not competent or request further proceedings to resolve issues about his competency before proceeding with the IPO hearing. In short, Kenneth's counsel did not raise any arguments about incompetency to the family court nor did the family court have an opportunity to rule on their merits, so these issues are not properly preserved. *See, e.g.*, *Curty v. Norton Healthcare, Inc.*, 561 S.W.3d 374, 377 (Ky. App. 2018) (purpose of requiring preservation statements is to ensure that issues on appeal were properly presented to the trial court and that trial court had opportunity to rule on these issues; lack of preservation can affect the standard of review employed).

Since these alleged errors are unpreserved and since Kenneth has requested palpable error review, we review these matters under CR[1] 61.02.[2] CR 61.02 provides that an appellate court may review insufficiently preserved issues

[1] Kentucky Rules of Civil Procedure.

[2] *Compare* Kentucky Rule of Criminal Procedure (RCr) 10.26, cited in Appellant's brief at page 5 to request review for palpable error.

for palpable error affecting a party's substantial rights and grant relief if manifest injustice results from the error.

Kenneth argues that any waiver of his right to a full evidentiary hearing before the IPO was entered would have to be clear and knowing. *See generally Clark v. Parrett*, 559 S.W.3d 872, 875 (Ky. App. 2018). And he points out he was not at the hearing to observe the proceedings, assist in his defense, or offer testimony. Therefore, he argues, he was denied due process, citing *Hawkins v. Jones*, 555 S.W.3d 459, 462 (Ky. App. 2018).

Clearly, the family court conducted a full evidentiary hearing with extensive witness testimony presented on behalf of both parties – albeit in Kenneth's absence. His counsel was present and indicated Kenneth and/or his parents wished to proceed to resolve the matter despite the family court's reluctance to proceed in his absence.

So, these facts are very different from *Hawkins*, in which neither the then-incarcerated respondent nor the respondent's attorney attended the final DVO hearing. And little to no evidence was presented at either of the two hearings in *Hawkins*. *Id.* at 461. In contrast to *Hawkins*, Kenneth's attorney was present and offered evidence and argument on his behalf in a lengthy evidentiary hearing.

Furthermore, conducting an IPO hearing in the respondent's absence may not violate due process where the respondent received notice of the hearing

but voluntarily chose not to attend.[3]  Kenneth had indisputably received notice of this hearing and had voluntarily chosen to enter treatment shortly before the scheduled hearing.  Although no one explicitly argued so at the hearing, an argument could have been made that Kenneth – an adult who had not been adjudicated incompetent or of unsound mind – was voluntarily absent and chose to enter treatment a few days prior to the scheduled hearing to avoid the proceedings.

We recognize that parties in proceedings on petitions for protective orders are entitled to some basic due process rights such as a meaningful opportunity to be heard and present evidence.  *See generally Wright v. Wright*, 181 S.W.3d 49, 53 (Ky. App. 2005).  But IPO proceedings are not criminal prosecutions; they are, in fact, civil actions.  *Parish v. Petter*, 608 S.W.3d 638, 641 (Ky. App. 2020).  *See also Smith v. Doe*, 627 S.W.3d 903, 912 (Ky. 2021) ("An IPO is an order of civil protection and an entry of an IPO against a minor does not equate to a conviction of a public offense.").

---

[3] *See Johnson v. Goodrich*, No. 2020-CA-0163-ME, 2021 WL 3435447, at *2-3 (Ky. App. Aug. 6, 2021) (affirming denial of CR 60.02 relief despite a party's absence from underlying DVO proceedings due to incarceration because the party made no efforts to be present at the DVO hearing such as filing a motion for transport or to be heard telephonically despite being given notice of the hearing and distinguishing case from *Hawkins v. Jones*).  We recognize such unpublished opinions are not binding authority.  *See* Kentucky Rules of Appellate Procedure (RAP) 41(A) (effective January 1, 2023).  *See also* former CR 76.28(4)(c) (in effect when this case was briefed in 2022).  However, there appear to be no published cases directly on point regarding the effects of any voluntary absence of a party from an IPO hearing.

Therefore, constitutional provisions pertaining only to criminal proceedings – including Section 11 of the Kentucky Constitution – are not applicable in this context. And a trial court's duties are different in civil cases than in criminal cases. In civil cases (unlike criminal cases), Kentucky precedent indicates a trial court is under no duty to take unrequested action to protect parties who have not formally been adjudicated incompetent. *Goff v. Walker By and Through Field*, 809 S.W.2d 698, 699 (Ky. 1991). As our Supreme Court explained:

> Civil Rule 17.03 requires that a trial court appoint a guardian ad litem to defend a defendant of unsound mind if the defendant's guardian or committee is unwilling or unable to act. *Straney v. Straney*, Ky., 481 S.W.2d 292 (1972) holds that the words "unsound mind" as used in CR 17.03 are technical words which mean a person who has been so *adjudicated.* The Court of Appeals held that while it may have been obvious that Thomas Goff was incompetent to aid in his defense, CR 17.03 did not apply. The fact that Goff was adjudicated incompetent six months after trial was considered to be of no consequence. The Court of Appeals interpretation of CR 17.03 in *Straney*, *supra*, is clear and correct.

> The initiation of incompetency proceedings in the district court is pursuant to K.R.S.[4] 387.500. Detailed standards and procedures are enumerated in the statute to protect the individual to be adjudicated. The letters from the two physicians fall far short of the legal adjudication of incompetency required by a jury pursuant to statute. The potential for abuse in declaring someone incompetent in any manner short of the statutory

---

[4] Kentucky Revised Statutes.

-10-

requirements is obvious. In this case, the appellees argue that the failure to begin incompetency proceedings until after trial was a trial strategy on the part of the Goffs in order to provide a basis for an appeal.

A trial court in a criminal case has a duty to conduct a competency hearing upon reasonable belief that a criminal defendant is incompetent to stand trial. RCr 8.06. Such an inquiry is prior to trial. There is no comparable civil rule.

If there is a need to adopt a competency determination by the trial judge prior to any trial, it should be addressed by a new civil rule outlining the procedure and the safeguards for all parties in detail.

. . . .

It is the holding of this Court that the trial judge in a civil case, in the absence of a legal adjudication of incompetency, has no duty to take steps on his own to protect the interests of any defendant other than as provided in existing CR 17.03. A party to the litigation believing he or she is adversely affected by the apparent but unadjudicated incompetence of another party should seek relief as the rules provide when a witness is absent or unavailable.

*Id. See also Smith v. Flynn*, 390 S.W.3d 157, 159-60 (Ky. App. 2012); CR 17.03; CR 25.02; KRS 387.500.

Despite the concerns noted in *Goff*, no rule of civil procedure has since been adopted which addresses pre-trial competency determinations in civil cases. And no civil rule has been adopted which is similar to RCr 8.06. As the Supreme Court recognized in *Goff*, RCr 8.06 does not apply to civil proceedings.

-11-

Neither does KRS 504.100 – cited on page 1 of Kenneth's reply brief – which is part of the Kentucky penal code pertaining to criminal prosecutions. Furthermore, precedent cited by Kenneth to support the proposition that trying an incompetent person violates due process was a criminal case. *See Drope v. Missouri*, 420 U.S. 162, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975). So, this precedent more specifically indicates that trying an incompetent person **for a criminal offense** violates due process.

The proceedings here were clearly civil in nature and there was no clear indication that Kenneth was totally incompetent despite his diagnoses of schizophrenia or being on the autism spectrum. Further, there was no evidence in the record that Kenneth was adjudicated incompetent or had a guardian or committee appointed for him. Also, Kenneth had indisputably recently driven a car (and thus presumably had a current driver's license) and he had graduated from college several years beforehand. So, despite any degree of partial disability, there was no clear indication of total incompetency. *See* KRS 387.500(1) and (2) (recognizing there are different degrees of disability and declaring: "Persons who are only partially disabled must be legally protected without a determination of total incompetency and without the attendant deprivation of civil and legal rights that such a determination requires.").

In sum, there was no duty for the family court to *sua sponte* order a competency hearing. Nor has Kenneth cited any authority establishing that the family court was obligated to deny the requests of counsel for both parties to proceed with the hearing. And clearly the family court attempted to be fair to both parties.

In addition to inquiring about the reasons for Kenneth's absence and whether a mental health petition was pending, the family court encouraged the parties to discuss whether alternate provisions, such as allowing him to be at his parents' house but only in the presence of a parent, might suffice. After Ellie explained how she would still feel unsafe given Kenneth's going onto her family's property unbeknownst to his parents in both December and April, the family court ultimately decided to retain the 500-foot restriction from her home. But the court also ordered a mental health assessment for Kenneth, limited the duration of the IPO to one year rather than the requested three years, and stated an intent to review the case frequently to see whether mental health providers might recommend steps to permit Kenneth's return home while also offering safety and peace of mind to Ellie.

The family court's issuance of the IPO undeniably affected Kenneth's substantial rights as it placed restrictions on where he was allowed to go. But any error did not result in a manifest injustice under the facts of this case. Given the

reasoning expressed in *Goff*, the family court was not required to take further unrequested action to protect Kenneth in the absence of an adjudication or even a clear allegation of incompetency.

Though Kenneth now argues the family court should have taken different steps, which trial counsel did not request at that time, the family court's actions were not "shocking or jurisprudentially intolerable" given these facts. Any unpreserved error did not result in manifest injustice. *See Summe v. Gronotte*, 357 S.W.3d 211, 216 (Ky. App. 2011). And though we decline to address whether there might be any reversible error had the issues been properly preserved, there is no reason to reverse for any unpreserved error in the family court's proceeding in Kenneth's absence without an unrequested competency hearing or continuance under the facts and circumstances here.

## II. No Reversible Error in Finding Stalking with Implicit Threat Occurred

Next, Kenneth argues the family court erred in concluding that his actions constituted stalking under the IPO statutes. As Kenneth's counsel argued to the family court that Kenneth's actions did not amount to stalking under the IPO statutes, this issue is preserved for review. We review the family court's factual findings on this issue for clear error and its decision to enter an IPO for abuse of discretion. *See Gomez v. Gomez*, 254 S.W.3d 838, 842 (Ky. App. 2008) (DVO

-14-

appeal).  *See also Smith*, 627 S.W.3d at 908 (noting statutes governing IPO and DVO proceedings are interpreted similarly).

Questions of law are reviewed *de novo*.  *Halloway v. Simmons*, 532 S.W.3d 158, 161 (Ky. App. 2017).  Questions of statutory interpretation and application are questions of law subject to non-deferential *de novo* review. *Adamson v. Adamson*, 635 S.W.3d 72, 77 (Ky. 2021).

IPO proceedings are governed by statutes in KRS Chapter 456, which refer to statutes defining stalking crimes in KRS Chapter 508.  "Following a hearing ordered under KRS 456.040, if a court finds by a preponderance of the evidence that dating violence and abuse, sexual assault, or stalking has occurred and may again occur, the court may issue an interpersonal protective order . . . ." KRS 456.060(1).  According to KRS 456.010(8), "'Stalking' refers to conduct prohibited as stalking under KRS 508.140 or 508.150, or a criminal attempt, conspiracy, facilitation, or solicitation to commit the crime of stalking[.]"

KRS 508.140(1)(a) defines the crime of stalking in the first degree as including conduct consisting of intentionally stalking another person and making an explicit or implicit threat with the intent to put the other person in reasonable fear of sexual contact, serious physical injury, or death.  KRS 508.150 defines the crime of stalking in the second degree as including conduct consisting of intentionally stalking another person and making an explicit or implicit threat with

-15-

intent to put the other person in reasonable fear of sexual contact, physical injury, or death.

KRS 508.130(1) defines stalking for purposes of KRS 508.130 to KRS 508.150 as follows:

> (a) To "stalk" means to engage in an intentional course of conduct:
>
>> 1. Directed at a specific person or persons;
>>
>> 2. Which seriously alarms, annoys, intimidates, or harasses the person or persons; and
>>
>> 3. Which serves no legitimate purpose.
>
> (b) The course of conduct shall be that which would cause a reasonable person to suffer substantial mental distress.

A course of conduct consists of two or more acts "evidencing a continuity of purpose." KRS 508.130(2).

Construing these statutes together, this Court has set forth the petitioner's burden of proof for obtaining an IPO for stalking as follows:

> To summarize, for an individual to be granted an IPO for stalking, he or she must at a minimum prove by a preponderance of the evidence that, an individual intentionally engaged in two or more acts directed at the victim that seriously alarmed, annoyed, intimidated, or harassed the victim, that served no legitimate purpose, and would have caused a reasonable person to suffer substantial mental distress, and that these acts may occur again. KRS 508.130 and KRS 456.060. Additionally, the individual must prove that there was an implicit or

-16-

> explicit threat by the perpetrator that put the victim in reasonable fear of sexual contact, physical injury, or death. KRS 508.150.

*Halloway*, 532 S.W.3d at 162.

Kenneth argues there is insufficient evidence that his actions were intentional due to his mental health issues. But though his parents testified to his diagnoses and his history of mental illness, he had not been adjudged incompetent and he does not point to any evidence that his actions were not intentional. Generally, a person presumably intends "the logical and probable consequences of his conduct[.]" *Saint Joseph Healthcare, Inc. v. Thomas*, 487 S.W.3d 864, 871 (Ky. 2016).

Kenneth also argues his words and actions were not threatening. We agree there appears to be no evidence of explicit verbal threats based on our review of the language used by Kenneth in his recorded oral messages and Facebook messages. But the family court orally stated a finding on the record that there was an implicit threat of sexual contact in Kenneth's "comments and texts" (apparently referring to messages left on the security system and Facebook messages which Ellie saw on her phone).

Kenneth cites for our consideration an unpublished case in which a protective order was reversed based on some similar conduct not amounting to stalking with threats. But that case is not binding authority. RAP 41(A); former

-17-

CR 76.28(4)(c). Furthermore, unlike here, the respondent in that case did not go to the petitioner's home after she made clear that contact was unwanted, but instead spoke to the petitioner at public places in addition to sending unwanted though not explicitly threatening text and email messages.[5]

Ellie contends that this case is more akin to a reported case in which an IPO for stalking was affirmed based partly on evidence of the respondent's unwanted entries into the petitioner's home in addition to other facts. *See Calhoun v. Wood*, 516 S.W.3d 357, 361 (Ky. App. 2017). In the present case, there is no evidence of Kenneth having actually gone into Ellie's home. But there is certainly evidence of his apparently attempting to enter her home wholly uninvited and then repeatedly coming onto her front porch later despite being told by others to stay off Ellie's family's property and leave her alone.

Ellie admitted to not having spoken or otherwise directly communicated with Kenneth for around five years. So, obviously she had not directly told him any contact was unwanted. However, there was evidence that

---

[5] *See Martin v. Connelly*, No. 2018-CA-001728-ME, 2019 WL 6998651, at *1 (Ky. App. Dec. 20, 2019) ("The communication at issue in this action involves relatively benign social encounters in public places and emails and texts that, while undesired, were not implicitly or overtly threatening."). *See also id*. at *6 ("[T]he parties' face-to-face encounters were all in public places . . . . There was no evidence that Martin attempted to isolate Connelly during these encounters, that he followed her out of the events, or that he ever tried to contact her at her home or work. His contact with Connelly was limited to a series of brief encounters in public and to email and text messages.").

-18-

Ellie's and Kenneth's parents communicated about Ellie being scared after the December incident and wanting to be left alone and that Kenneth's parents and police told Kenneth to stay off Ellie's family's property and leave her alone. Leaving aside any hearsay or similar concerns (which were not preserved by objection), there was evidence which indicated Ellie's not desiring contact with Kenneth had been conveyed to him – albeit not directly from Ellie.

Kenneth argues that his actions were akin to that of a college student unsuccessfully trying to get a date with another student by sending flowers and Facebook messages and receiving no response. But that argument ignores other evidence such as that of his apparent attempt to enter her home (uninvited) at midnight. Ellie testified to the security system videorecording showing Kenneth opening the storm door and "jiggling the handle to get in" and then punching in numbers in the keypad. In sum, we cannot say that the evidence, as a whole, compels a finding that his actions were simply the unwanted but non-threatening gifts and communications of a person professing unrequited affection.

Similarly, in both *Calhoun* and the instant case, there was evidence of the respondent continuing to try to contact the petitioner after the petitioner made clear – albeit indirectly here – that any contact was unwanted. *See id*. However, the facts in *Calhoun* are somewhat different as there was also evidence that the respondent damaged the petitioner's car tire so she could not leave.

We affirmed the IPO in *Calhoun*, determining that the statutory requirements for issuing an IPO for stalking were met. We specifically held that the evidence was sufficient to support a finding of implicit threat of physical injury or death by damaging her car. *Id.* Although we did not expressly state so in *Calhoun*, surely the respondent's unauthorized entries into the petitioner's home could also support an inference of an implicit threat of death, physical injury, or sexual contact. And here, the evidence of an apparent attempt to enter Ellie's home at midnight could also support an inference of an implicit threat of death, physical injury, or sexual contact.

Furthermore, the family court's oral finding of an implicit threat was supported by the family court's written findings of fact – which explain how the combination of his actions implicitly conveyed a threat placing Ellie in reasonable fear for her safety:

> -Last December [Kenneth] went to [Ellie's] front door in the middle of the night and tried to get in. [Ellie's] family told his [Kenneth's] parents immediately and called the police. [Kenneth's] father testified he and the police told [Kenneth] not to go back over to [Ellie's] house.
>
> -Then in April, [Kenneth] came to her house on three occasions in one day leaving flowers and talking to her security camera every time and telling he loved her and has always loved her, would be her protector etc. He looked directly at the camera every time like he was talking directly to her, in addition to mumbling to

himself. He brought two different bouquets of flowers and then left her a gold rose on third trip to the door.

-He has also messaged her on Facebook Messenger. They are not friends and [she] has never accepted his requests but [she] can see the messages he sends her. They appear sexual in nature and imply that [Kenneth] has been at least watching [Ellie] and imagining some kind of interaction or relationship between them.

-Due to this [Ellie] is afraid to leave her house to walk to her car or go outside. When her parents are home, she has to call neighbors to watch her walk to her car etc. This week when his car returned to the house next door she was so afraid she locked herself in her home and called the police.

[Kenneth] diagnosed [sic] with schizo effective [sic] disorder and on the autism spectrum. He has completed high school and college. He is currently living in an apartment. He has frequently gone missing from his parents [sic] care requiring missing persons reports and golden alerts and they have not communicated with [Ellie] or her family about that to give them a heads up. Sometimes [Kenneth] has "episodes" both on [and] off his medication. His parents have had to place a tracker on his car to ensure they know his whereabouts.

-Parents testified they believed that if he stayed on his meds they could control his behavior and [it] would be safe for him to live in the home; however, the repeated incidents with regard to [Ellie] while on his medication, and the multiple times they have had to call police when he has gone missing, makes it clear they can not.

 Court finds that [Kenneth] engaged in a pattern of behavior that placed [Ellie] in reasonable fear for her personal safety and served no legitimate purpose. Court further finds that given [Kenneth's] mental health concerns, his apparent fixation with [Ellie], and his

families [sic] inability to prevent or stop the contact the
Court finds further acts of stalking may occur and an
Order is necessary to protect [Ellie].

Essentially, though the language employed by Kenneth in messages is not explicitly threatening, the family court found an implicit threat based on the context in which the messages were made and non-verbal events such as the apparent attempt to enter Ellie's home uninvited at midnight. Furthermore, these findings of fact are supported by substantial evidence, including Ellie's testimony.

Ellie testified that she and Kenneth were next door neighbors but otherwise had no relationship and had not even spoken for around five years. She also testified that Kenneth had threatened a neighbor about five years ago. Kenneth's mother testified to remembering him having feelings for a neighbor and some sort of trouble ensuing which the families worked out without going to court though Kenneth's parents did not recall him making any threats.[6]

Ellie testified that Kenneth's apparent attempt to enter her house in December through punching numbers in the security pad occurred around

---

[6] Parties' parents' testimony about Kenneth's alleged prior communications with or feelings toward the neighbor might pose hearsay concerns. *See generally* Kentucky Rules of Evidence (KRE) 802 *et seq*. However, no issues about hearsay were raised on appeal and neither party has drawn our attention to any objections to this testimony on hearsay or other grounds.

midnight. Also, she testified he had mumbled something in his recorded messages in April about "protection" – which she construed as referring to birth control.[7] She testified that she believed Kenneth was making a request for sexual contact in asking whether she was one of "those females" in a Facebook message. And she testified that his message inquiring about the meaning of her smiling, frowning, and shrugging scared her because she believed it indicated he was watching her somehow though she could not see him at the time. There was also testimony about their houses being located in such a way that perhaps Kenneth could have seen into a window in her house from his house.

Though there may be some question whether language about "one of those females" referred to sexual activity on an objective rather than subjective basis, the family court's finding an implicit threat was made is not clearly erroneous. Regardless of the lack of direct explicit threat in Kenneth's language, evidence of his apparent attempt to enter Ellie's home uninvited at midnight and his returning there three times months later, despite being told not to do so, could support an inference of implicit threat. Similarly, his message recounting

---

[7] We are aware that Kenneth's trial attorney and his mother believed there was an alternate explanation for the mention of "protection" – that Kenneth perceived that Ellie's visiting friends (strangers to him) posed a threat to her and that he was offering to provide protection to her from this perceived threat. Nonetheless, the Ellie's testimony about hearing Kenneth mumble something about protection in a recorded message and perceiving this to possibly refer to birth control was some evidence supporting an implicit threat of sexual contact.

observing Ellie smiling, frowning, and shrugging, which might suggest that he was watching her, could also support an inference of implicit threat.

While perhaps another fact-finder might not construe these words and actions as implicitly threatening, we must defer to the family court's assessment of the weight of the evidence and the credibility of witnesses despite any conflicts in the evidence. And we can only disturb its factual findings if not supported by substantial evidence. *See Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003); CR 52.01. *See also Gomez*, 254 S.W.3d at 842.

There was substantial evidence supporting the family court's finding of stalking, with implicit threats, which might occur again. Furthermore, we discern no abuse of discretion or misapplication of the law in the family court's concluding the requirements of KRS 456.060 were met and deciding to issue the IPO.

Further arguments raised in the parties' briefs which are not addressed herein lack merit or relevancy to our resolution of this appeal.

## CONCLUSION

For the foregoing reasons, we affirm the Fayette Family Court's judgment.

ALL CONCUR.

BRIEFS FOR APPELLANT:

John Gerhart Landon
Lexington, Kentucky


ORAL ARGUMENT
FOR APPELLANT:

John Gerhart Landon
Lexington, Kentucky

BRIEF FOR APPELLEE:

Christopher A. Spedding
Lexington, Kentucky


ORAL ARGUMENT
FOR APPELLEE:

Christopher A. Spedding
Lexington, Kentucky